**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **THOMAS E. CLARDY** | ) | |
| **Petitioner,** | ) | |
| | ) | **Civil Action No. 3:19-cv-01098** |
| **v.** | ) | **Judge Trauger / Frensley** |
| | ) | |
| **BERT C. BOYD, WARDEN,** | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

In July 2007, a jury convicted Petitioner Thomas E. Clardy of one count of first-degree murder, two counts of attempted first-degree murder, and three counts of reckless endangerment. *State v. Clardy*, 2009 WL 230245, at *1 (Tenn. Crim. App. Feb. 2, 2009), *perm. app. denied* (Tenn. June 15, 2009); Docket No. 1 at 5-6. Clardy was sentenced to a mandatory term of life imprisonment. *Id.* Having sought relief in state courts, Clardy has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in which he argues (a) that he received ineffective assistance of counsel at trial in violation of his rights under the Sixth and Fourteenth Amendments of the U.S. Constitution, and (b) that he is actually innocent of all the crimes of which he was convicted. Docket No. 1 at 48-49. As a component of his request for habeas relief, Clardy has also requested that this Court grant him an evidentiary hearing should this Court determine the need for further factual development. *Id.* at 82.

For the reasons that follow, having considered the parties' arguments, the underlying record, and the stringent standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the Court will recommend that Clardy's petition be **GRANTED**. Further, Clardy's request for an evidentiary hearing is **DENIED**.

# I.     BACKGROUND

## A.     Factual Background

The Tennessee Court of Criminal Appeals ("TCCA") summarized the factual background of the case as follows:

> On July 29, 2005, a group of men fired shots at Kirk, Melissa, and Kent Clouatre[1] at an automobile body shop in Madison, Tennessee. *State v. Clardy*, No. M207-02729-CCA-R3-CD, 2009 WL 230245, at *1 (Tenn. Crim. App. Feb. 2, 2009), perm. app. denied (Tenn. June 15, 2009). One man's shots killed Kirk and wounded Melissa, Kirk's wife. *Id.* Another man's shot wounded Kent, Kirk's twin brother. *Id.* During the shooting, Kirk and Melissa's two children were sitting in a car at the body shop. *Id.* The group of men retreated to their vehicle and fled the scene. *Id.* Police recovered several spent cartridge casings, live rounds, and projectile fragments from the scene but did not recover any weapons believed to belong to the assailants. *Id.* at *7-8.
>
> The identification of the perpetrators was the central issue during the investigation and at trial. Kent testified about his identification of [Clardy] and testified regarding his descriptions of the other men. At trial, Melissa did not remember giving descriptions of the suspects to the police, even when confronted with her statements to the police.
>
> Kent said that a man whom he knew as "T" fired the shots that killed Kirk and struck Melissa. "T" was the only one of the three suspects that Kent had seen before. Kent identified Petitioner as "T" in a photographic lineup and at trial. Kent testified that "T" used a "[s]emiautomatic .40 caliber" pistol. At the beginning of the investigation, Melissa gave police officers the initial "D" when attempting to identify one of the perpetrators, but later the initial changed to a "T." Kent used the initial "T" every time that he was interviewed by Officer Cynthia Quirouette. Officer Quirouette maintained that "T" was the initial that came out through the rest of the investigation. However, she was not confident in the truthfulness of the witnesses during the investigation.
>
> When describing the suspect who shot at him, Kent said, "He's a little bit heavy set man, little shorter. He had gold, I guess in his teeth, diamonds were set sideways, when he gritted [sic] at me." He described the weapon used by this man as a .38 caliber revolver. Kent described the third individual as a taller, thin guy. Melissa only described the third man. Her description was limited to the fact that he was wearing a blue shirt. When describing this suspect's gun, Kent was unsure of the caliber, but stated that it was semiautomatic. However, neither Kent nor Melissa

---

[1] Throughout this Report and Recommendation, the Court respectfully refers to Kent Clouatre as "Kent" since there are two Mr. Clouatres involved in the case.

recounted this individual firing a weapon.

Melissa described the vehicle used by the suspects as a "'96 or '97 Sable or Taurus, blue with an oval back." Melissa also described the color as "blue or possibly green." According to Officer Quirouette, Kent described the vehicle as an "'84 to '86 four-door Buick Century or Celebrity, silver or gunmetal gray." Officer Quirouette admitted that the descriptions were "totally different." However, at trial, Kent disavowed any statement that the car was a Buick and asserted that the vehicle was a "forest green Ford Taurus." Royleesha Mason, Petitioner's wife at the time of the crime, owned a teal green 1996 Mercury Sable, which is very similar in appearance to a Ford Taurus. That car was frequently driven by [Clardy].

*Clardy*, 2018 WL 5046032, at *1-2 (Tenn. Crim. App. Oct. 17, 2018), *perm. app. denied* (Tenn. Apr. 12, 2019) (footnote omitted).

### B.    Procedural History

### 1.    Trial and Direct Appeal

After the trial, a jury convicted Clardy of one count of first-degree murder, two counts of attempted first-degree murder, and three counts of reckless endangerment. *Id.* Clardy was sentenced to a mandatory life sentence on the first-degree murder conviction. Docket No. 1 at 6. Clardy then timely appealed his convictions to the TCCA, which affirmed the state trial court judgements. *State v. Clardy*, No. M2007-02729-CCA-R3-CD, 2009 WL 230245, at *1. Clardy then timely appealed to the Tennessee Supreme Court, which denied review. *State v. Clardy*, No. M2007-02729-SC-R11-CD (Tenn. June 15, 2009); Docket No. 10-13.

### 2.    Post-Conviction Proceedings

In December 2009, Clardy filed a timely *pro se* petition for post-conviction relief. Specifically, he argued that trial counsel rendered ineffective assistance based on the following: (1) failure to investigate alternative suspects; (2) failure to present an alternative theory of the crime; (3) failure to obtain and impeach the surviving victims' testimony; (4) failure to raise on direct appeal the State's failure to disclose evidence; (5) abandonment of a motive defense; (6)

failure to fully interview family witnesses and file proper notice of alibi testimony; (7) failure to call the defendant at trial; (9) failure to investigate Detective Satterfield's prior misconduct; and (10) failure to request DNA testing, including of a blood trail found at the scene. Docket No. 10-14 at 44-50.

After the petition was amended multiple times, Clardy, with the assistance of counsel, filed the operative amended petition ("TCCA Operative Amended Petition") for post-conviction relief on September 6, 2016. Doc No. 10-16 at 327-38. The Operative Amended Petition incorporated by reference the claims that Clardy asserted in his *pro se* petition and requested relief on additional grounds. *Id.* at 327. Those additional grounds included (1) failure to conduct ballistics testing; (2) failure to obtain an eyewitness identification expert; (3) failure to obtain handwritten notes from victims' interviews; (4) failure to impeach the descriptions of the shooters offered by the victims during trial; (5) failure to properly notice Clardy's wife as an alibi witness; (6) failure to obtain and inspect photos from the crime scene; (7) failure to complete DNA testing of blood samples collected at the crime scene, including from the blood trail leading away from the crime scene; (8) failure to conduct date-time analysis for the location of the shooting and Clardy's home; (9) failure to investigate and present argument about the victim's involvement in illegal drugs; (10) failure to impeach Kent Clouatre with his prior convictions; (11) failure to present evidence of Clardy's inability to wear gold teeth; and (12) failure to investigate or interview witness Darrell Cherry. *Id.* at 331-36. The TCCA Operative Amended Petition also asserted an actual innocence claim. *Id.* at 336.

A post-conviction hearing was held in September 2016, and the post-conviction court subsequently denied Clardy's petition for post-conviction relief in a written order on May 17, 2017. Docket No. 1-5; Doc No. 1-2. The post-conviction court order only addressed the claims

4

that were expressly asserted in the TCCA Operative Amended Petition and did not consider any of the issues raised in Clardy's *pro se* petition. Docket No. 1-2; Docket No. 1 at 8. Petitioner then moved the court in a hearing to rule on the additional grounds asserted in his *pro se* petition, which the court denied without explanation. Docket No. 10-19 at 8.

Clardy then timely filed a notice of appeal of the post-conviction court's order denying his petition for post-conviction relief. Docket No. 10-21. In his appeal before the TCCA, Clardy asserted an ineffective assistance of counsel claim based on the following errors committed by trial counsel: (1) failure to investigate and present evidence of alternative suspects; (2) failure to file an alibi notice for Clardy's then-wife; (3) failure to investigate or test the blood trail at the crime scene; (4) failure to request or conduct DNA testing of other items found at the scene; (5) failure to impeach the testimony of Detective Satterfield; (6) failure to effectively cross-examine and impeach Kent Clouatre; (7) failure to make the jury aware that Melissa Clouatre had identified the wrong suspect in the photo lineup; (8) failure to obtain an eyewitness identification expert; and (9) cumulative error. *Id.* The appeal also asserted his actual innocence and objected to the post-conviction court's refusal to accept photos of Dantwan Collier as an offer of proof. *Id.*

The TCCA subsequently affirmed the post-conviction court's denial of Clardy's petition for relief. *Clardy*, 2018 WL 5046032, at *1-2 (Tenn. Crim. App. Oct. 17, 2018).[2] The TCCA held, however, that the post-conviction court erred in refusing to accept Petitioner's offer of proof of photos of Dantwan Collier but nonetheless determined that the error was harmless. *Id.* at *8-9. After the TCCA denied Clardy's request for a rehearing of his appeal, Clardy then timely appealed to the Tennessee Supreme Court. Docket No. 10-32, 33. The Tennessee Supreme Court denied

---

[2] The TCCA's summary of the facts adduced in the post-conviction hearing appears in its discussion and analysis of each subclaim. As such, the TCCA's summary of the post-conviction evidence also appears in this Court's discussion of each subclaim below.

Clardy's appeal. Docket No. 10-32, 33.

In December 2019, Clardy petitioned this Court for habeas relief under 28 U.S.C. § 2254. Respondents filed an answer on March 3, 2020, to which Clardy filed a response on May 5, 2020. Docket No. 12; 18.

## II.     LEGAL STANDARD

### A.     Standard of Review of State Court Convictions

A state prisoner can petition a federal court for relief of a state court conviction by applying for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under AEDPA, codified in 28 U.S.C. §2254, a district court may not grant habeas corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1), (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause if the state court decides a question of law or a materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

To grant habeas relief under the "unreasonable application" clause, the Court must find that the state court's decision was "objectively unreasonable," and not simply an erroneous or incorrect, application of the correct legal principle to the facts. *Id.* at 409-11. But even an incorrect

6

state court decision is not necessarily unreasonable. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.") (*citing Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U. S. 86, 103 (2011).

AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F. 3d 1131, 1134 (6th Cir. 1998). When the record supports the state court's findings of fact, those findings are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### B.     Procedurally Defaulted and Unexhausted Claims

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by exhaustion requirements and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). For a claim to be considered on habeas review, the petitioner must first exhaust state remedies for that claim. 28 U.S.C. §2254(b)(1). Exhaustion requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *see O'Sullivan*, 526 U.S. at 842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's

highest court. *Adams v. Holland*, 330 F. 3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

If a claim has never been presented to the highest available state court and is now barred from such presentation by a state procedural rule, that claim is procedurally defaulted and barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default may also occur when a petitioner presented the claim to the highest court, but the state court was prevented from "reaching the merits of the petitioner's claim" because the petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground. *Id.* (*citing Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986)).

Procedurally barred claims nonetheless may be considered on their "merits only if the petitioner establishes (1) cause for his failure to comply with the state procedural rule and actual prejudice from the alleged violation of federal law or (2) demonstrates that his is 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Wallace v. Sexton*, 570 Fed. Appx. 443, 452 (6th Cir. 2014) (*quoting Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *see also House v. Bell*, 547 U. S. 518, 536 (2006). To show sufficient "cause," Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488. To demonstrate prejudice, Petitioner must show that the inadequacies worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The prejudice requirement is not met where there is strong evidence of a petitioner's guilt and lack of evidence for his claim. *Id.* at 172.

### C. Standard for Granting Evidentiary Hearings

Since Clardy filed his petition for habeas corpus in this Court, the law on the availability

of evidentiary hearings in federal court for state habeas petitioners changed. As the Supreme Court recently recognized, AEDPA "restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022). Specifically, the statute allows the development of new evidence in "two quite limited situations:" (1) when the claim relies on a "new" and "previously unavailable" "rule of constitutional law" made retroactive by the Supreme Court, or (2) when the claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence." *Id.* at 2044 (quoting 28 U.S.C. § 2254(e)(2)).

Even if a prisoner can satisfy either of those exceptions, to obtain an evidentiary hearing, the prisoner still must show by "clear and convincing evidence" that "no reasonable factfinder" would have convicted him of the crime charged. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022) (quoting 28 U.S.C. § 2254(e)(2)(A)(i), (ii)).

Where a petitioner relies on *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), to excuse a procedural default, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice," *Shinn v. Ramirez*, 142 S. Ct. at 1739, if the petitioner "failed to develop the factual basis of [his] claim in State court proceedings." 28 U.S.C. § 2254(e)(2).]

### III.    Analysis of Petitioner's Request for an Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing this court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U. S. 465, 474 (2007). Additionally, the court must take into account the deferential standards prescribed by § 2254. *See Id.*

The petitioner seeks an evidentiary hearing only to the extent "the court determines there

is a need for further factual development." Docket No. 1, p. 82; Docket No. 18, p. 25. Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro,* 550 U. S. at 574.

### IV. Analysis of Clardy's Ineffective Assistance of Counsel Claims

Clardy first argues that trial counsel rendered ineffective assistance of counsel on the following grounds: trial counsel (1) failed to investigate ballistics testing of firearms that would have identified viable alternative suspects; (2) did not provide proper notice of Roylessha Mason's alibi testimony; (3) did not challenge the photo lineups; (4) failed to obtain and present testimony by an expert on eyewitness identifications; (5) neglected to adequately investigate the crime scene, including the blood trail; and (6), failed to effectively cross-examine Kent about various drug-related facts and evidence. Docket No. 1 at 50-51.

To establish an ineffective assistance of counsel claim that warrants federal habeas corpus relief, a habeas petitioner must satisfy the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). That is, he or she must demonstrate (1) counsel's constitutionally deficient performance, and (2) actual prejudice as a result of such ineffective assistance. *Id.* at 687, 694. Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687-88. A reviewing court's scrutiny is to be "highly deferential" of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id.* at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id.*

Prejudice is established when the petitioner can demonstrate to a reasonable probability

that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but rather, whether the state-court's decision that Strickland was not met warrants relief under AEDPA standards. *See Richter*, 562 U.S. at 105 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). This creates a "doubly" deferential standard of review in federal habeas proceedings. *Id.* Accordingly, when a *Strickland* claim has been rejected on its merits by a state court, a petitioner "must demonstrate that it was necessarily unreasonable" for the state court to rule as it did in order to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

Thus, the question for this Court is whether the TCCA's adjudication of Clardy's ineffective-assistance-of-counsel claims resulted in a decision that was contrary to or involved an unreasonable application of federal law as determined by Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence presented in state court. *Id.* § 2254(d)(1), (2).

## A.    Subclaim 1 – Failure to Independently Test Ballistics

Clardy first argues that the TCCA's determination that trial counsel's failure to obtain independent ballistics testing was a tactical decision that was unreasonable and without support in the record. Docket  No. 1 at 53-54. This claim was fully exhausted in state court and is properly before the Court on habeas review.

The TCCA rejected this claim on deficiency grounds without reaching the issue of prejudice. *Clardy*, 2018 WL 5046032, at *3-4. This Court finds that the TCCA's determination was reasonable and adequately supported by the record.

The TCCA summarized the evidence presented at the post-conviction hearing as it relates to this subclaim as follows:

> Pursuant to an agreed order entered by the post-conviction court in November of 2015, Bridget Chambers, a forensic firearms examiner with the Metro Nashville Police Department, reexamined cartridge casings of three different calibers that were recovered from the crime scene. Upon reexamination, she discovered a match for the two .40 Smith and Wesson caliber cartridge casings. Ms. Chambers matched those casings to a Glock 23 handgun that was used in a July 5, 2006 crime by an individual named Dantwan Collier, who had "gold teeth." Additionally, Ms. Chambers matched the two 9mm cartridge casings recovered from the crime scene to other 9mm cartridge casings that were found at the scene of a January 5, 2006 homicide involving Dantwan Collier's cousin, Thomas Collier. Finally, Ms. Chambers matched the .380 auto cartridge case to a Hi-Point pistol chambered in .380 auto that had been used in a 2006 case. No explanation was given for the significance of the match of the .380 auto cartridge.
>
> Prior to Clardy's trial in July of 2007, trial counsel did not request any ballistics testing in Clardy's case. Trial counsel explained, "I didn't want to give the State an opportunity to find something they may have missed if [Clardy's] DNA was there. The ballistics, nobody had tied – nothing had been tied to [Clardy.]" Trial counsel did not recall a weapon being associated with Clardy and did not recall Clardy having any prior convictions for possession of a firearm. Had trial counsel known that the ballistics from the cartridge casings would match weapons used in two other crimes prior to trial, she "probably" would have used that information as part of Clardy's defense.

*Id.* at *3-4. The TCCA then determined that trial counsel's decision to forgo ballistics testing was a tactical choice at the time and did not constitute deficient representation. *Id.* It reasoned:

> The post-conviction court found that trial counsel's decision to decline ballistics testing of the cartridge casings recovered from the crime scene was not deficient performance. The post-conviction court attributed to hindsight [Clardy's] argument that an alternate suspect could have been developed from ballistic testing. The post-conviction court surmised that ballistics results linking the recovered cartridge casings to a gun used by another person would not necessarily rule out [Clardy's] involvement in the crime because there were three suspects.

Like the post-conviction court, we recognize that hindsight is always twenty-twenty. Now that ballistics testing has been conducted, revealing exculpatory evidence, it is easy to look back at trial counsel's decision to forego ballistics testing with a critical eye. However, if the ballistics testing had revealed a match to a firearm registered to [Clardy], then [Clardy] would have had abysmal chances of prevailing at trial. We evaluate trial counsel's actions "from the attorney's perspective at the time," and at the time there was no physical evidence linking [Clardy] to the crime scene. At the time that she was preparing for trial, there was a chance that ballistics testing might reveal either exculpatory or inculpatory evidence. Rather than take a risk, trial counsel made the tactical decision to play it safe and argue that Kent's identification, the only thing linking [Clardy] to the crime, was inaccurate and incorrect.

*Id.* at *4 (citation omitted). The TCCA correctly identified and summarized the *Strickland* standard applicable to Clardy's claim. Therefore, the question for the Court is whether the state court applied *Strickland* reasonably. *Harrington v. Richter*, 562 U.S. 86, 101, 105 (2011). ("The question is whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard.") (emphasis added). AEDPA, along with *Strickland*, requires this Court to give double deference to the findings of the TCCA. *Brown v. McKee*, 460 Fed. Appx. 567, 579 (6th Cir. 2012) ("[T]he Court must determine whether the state court's application of Strickland was unreasonable, not whether defense counsel's performance fell below the *Strickland* standard.") (citation omitted).

This Court is satisfied that the TCCA's determination was reasonable and adequately supported by the record. Trial counsel's testimony, which the TCCA credited, indicates that she decided against ballistics testing after she considered its risks in light of the government's case against Clardy. *Clardy*, 2018 WL 5046032, at *4; Docket No. 1-5 at 197. Based on her testimony before the post-conviction court, trial counsel recognized that the government's case was weak, noting that the only evidence it had linking Clardy to the crime scene was impeachable eyewitness testimony. Docket No. 1-5 at 191, 196-97. Instead of pursuing independent ballistics testing, trial counsel strategically chose to attack the weakness in the government's case by focusing on that lack of evidence and discrediting the only piece of evidence the government had presented against

Clardy: the eyewitness testimony. Docket No. 1-5 at 196 ("It came down to the surviving twin's identification of Thomas, he had known him before, and I focused on him saying to Detective Satterfield that the shooter had tattoos on his hands."). Altogether, this suggests that trial counsel exercised "reasonable professional judgment" to forgo ballistics testing after she "evaluated or weighed [its] risks and benefits" in context of the entire case. *See Parish Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after less than a complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

Indeed, *Strickland* permits counsel to "make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Harrington,* 562 U. S. at 107-08 (citation omitted). It was at least arguable that a reasonable criminal defense attorney could decide to forgo an inquiry into ballistics testing in a case like this where the prosecution's entire case hinged only on eyewitness testimony. *See Harrington*, 562 U.S. at 107, 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."). Trial counsel instead chose to pursue a different route as part of her defense strategy—one that she considered to be less risky to Clardy at the time. Docket No. 1-5 at 196 ("I didn't want to give the State an opportunity to find something they may have missed if [Clardy's] DNA was there. The ballistics, nobody had tied – nothing had been tied to [Clardy.])"

That trial counsel apparently always believed that Clardy was innocent and did not recall a firearm ever being linked to Clardy does not necessarily render the state court's application of

S*trickland* unreasonable.[3] Docket No. 1-5 at 197; *see also Harrington*, 562 U.S. at 107 ("*Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."). In deciding to forgo ballistics testing, trial counsel recognized that there was no physical evidence linking Clardy to the scene of the crime and wanted to keep it that way. Such a decision is a matter of trial strategy and not deficient performance. Therefore, this claim is denied.

### B.  Subclaim 2 – Failure to Properly Notice Alibi Witness

Clardy next argues that the TCCA contravened clearly established federal law in finding that trial counsel did not provide ineffective assistance when trial counsel failed to properly notice the alibi testimony of Clardy's then-wife, Royleesha Mason. Docket No. 1 at 58. Clardy fully exhausted this claim in state court, and it is properly before the Court on habeas review. The Court finds that the TCCA's decision was reasonable and adequately supported by the record.

The TCCA's summation of the facts adduced at trial and the post-conviction hearing is as follows:

> At trial, Kent estimated that the shooting occurred between 10:15 and 10:30 p.m. However, Chrystal Waltz, a private investigator hired by [Clardy's] counsel, revealed at the post-conviction hearing that the 9-1-1 call occurred at 10:48 p.m., and Melissa's testimony at trial makes it appear as though she made the 9-1-1 call immediately after the shooting.

> The State objected to Ms. Mason's statement on direct examination that Petitioner was at home playing video games at the time of the crime. The State argued that this was alibi testimony and that Petitioner had not given notice that Ms. Mason would be an alibi witness.[4] Trial counsel did not see [Clardy's] wife as a credible alibi witness, and did not

---

[3] Trial counsel testified at the post-conviction hearing that she could not recall whether Clardy had any firearm-related charges but did recall other assault and drug charges. Doc. No. 1-5 at 197.

[4] Following the objections, Judge Norman instructed the jury to disregard the statement on the ground that it was opinion evidence. (Doc. No. 1-4 at 304-05). The reason for the instruction was because trial counsel had failed to provide proper notice of Ms. Mason's alibi testimony. (Id. at 299-300). Despite this, Petitioner argues that Judge Norman did not tell the jurors "why they were to disregard the testimony." Doc. No. 1-0 at 58. However, a review of the trial transcript

file a notice of alibi witness for [Clardy's] wife.[5] At any rate, practically the same information was admitted, without objection, during the State's cross-examination of Ms. Mason when the prosecutor asked, "[I]t's your testimony that you know that [Clardy] was home at your house on Buena Vista that whole day and that whole evening?," to which Ms. Mason responded, "Yes, he was."

Shakisha Thompson was able to testify as an alibi witness for [Clardy] at trial. She testified that she picked up one of Ms. Mason's sons to take him bowling. When she returned at around 10:30 or 11:00 p.m., [Clardy] answered the door. Ms. Thompson recalled [Clardy] being calm and neatly dressed. [At the post-conviction hearing, t]rial counsel remembered filing a notice of alibi witness for Ms. Thompson. Trial counsel thought Ms. Thompson was "level headed," "didn't have a dog in the hunt," and "wasn't . . . taking sides."

*Clardy*, 2018 WL 5046032, at *5. The TCCA then determined that trial counsel's failure to timely provide alibi notice for Ms. Mason did not prejudice Clardy. *Id.* at *6. It reasoned:

[Clardy] has failed to show that he was prejudiced by this decision made by trial counsel. Ms. Mason essentially presented an alibi for [Clardy] on cross-examination when she stated that [Clardy] was at home with her the "whole day" and "whole evening" of the crime. Also, [Clardy] presented Ms. Thompson as an alibi witness and she offered testimony placing [Clardy] at home. [Clardy] has failed to show that more specific testimony from Ms. Mason providing an alibi would have changed the outcome of the trial.

*Id.*

The TCCA only cursorily determined that trial counsel's conduct was not deficient because "[Clardy] was able to present an alibi via a different witness." *Id.* at *5. That reasoning, and the rest of TCCA's analysis of this claim, seems to this Court to be more consistent with an analysis of *Strickland* prejudice. *See Strickland*, 466 U.S. at 695.

"When a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court. The unadjudicated prong is reviewed de novo." *Rayner v. Mills*,

---

demonstrates that Judge Norman told the jurors to disregard the testimony because it was improper opinion evidence. Doc. No. 1-3 at 304-05.
[5] This observation made by the TCCA comes directly from trial counsel's testimony at the post-conviction hearing.

685 F. 3d 631, 638 (6th Cir. 2012). Because this Court construes the TCCA's opinion to only address *Strickland* prejudice, this Court will review *Strickland* deficiency *de novo*.[6] See id.

Clardy characterizes trial counsel's action as a "failure to follow proper notice procedures" and an "inexcusable error," Docket No. 1 at 58, while Respondent describes it as a conscious choice that trial counsel made because she "didn't really hold a lot of stock in [his wife's] credibility as an alibi witness." Docket No. 12 at 13 (citing Docket No. 1-5 at 201). The TCCA agreed with Respondent that trial counsel "did not see [Clardy's] wife as a credible alibi witness," and suggested that was the reason counsel "did not file a notice of alibi witness for [her]." *Clardy*, 2018 WL 5046032, at *5.

Although neither the TCCA nor Respondent characterized the decision as a tactical one, this Court has found some evidence in the record, specifically in trial counsel's post-conviction hearing testimony, suggesting that she made a strategic decision by not filing alibi notice for Ms. Mason. Trial counsel testified that she had concerns about Ms. Mason's credibility. Docket No. 1-5 at 201-02. But she did not share the same concerns about Ms. Thompson, for whom trial counsel timely filed a notice of alibi witness and who testified at trial as to Clardy's whereabouts as an alibi witness. *Id.* Rather than elicit alibi testimony from a witness she considered unreliable, trial counsel testified that she instead chose to call to the stand Ms. Thompson, who she perceived to be more credible. *Id.* Under *Strickland*, this may be considered trial strategy. *See Strickland*, 466 U.S. at 689; *Parish Towns v. Smith*, 395 F. 3d 251, 260 (6th Cir. 2005) ("[F]actors tending to diminish [the witness's] credibility might support a strategic decision not to call [him] at trial . . .")

---

[6] Of course, the TCCA's decision was proper in denying the claim based on Strickland prejudice alone. Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). For completeness's sake, this Court takes up the deficiency prong.

(citation omitted).

Even if trial counsel was deficient in failing to provide alibi notice for Ms. Mason in a timely fashion,[7] Clardy has failed to show that TCCA's finding of a lack of prejudice was contrary to applicable law or a consequence of an unreasonable determination of the facts. Even though trial counsel did not provide timely alibi notice for Ms. Mason, the TCCA reasoned that Ms. Mason nonetheless presented an alibi for Clardy on cross-examination without objection, which ultimately made it into the record.[8] *Clardy*, 2018 WL 5046032, at *5. According to the TCCA, Clardy failed to show that "more specific testimony from Ms. Mason providing an alibi would have changed the outcome of the trial." *Id.*

In addition to Ms. Mason's testimony making it into the record, the TCCA recognized that Clardy also presented alibi testimony from Ms. Thompson, who testified at trial that she picked up one of Ms. Mason's sons to take him bowling. *Id.* Altogether, this evidence more than supports the TCCA's determination that there was a reasonable probability that the outcome of the trial would not have been different had trial counsel timely filed alibi notice for Ms. Mason.

This Court finds that the cases that Petitioner cites for support are distinguishable on the basis that the alibi testimony at issue in those cases were excluded in their entirety—in other words, the alibi testimony in those cases was never presented to the jury, either on direct or cross

---

[7] Despite trial counsel's testimony at the post-conviction hearing suggesting that she consciously chose not to file alibi notice for Ms. Mason, this Court acknowledges that other parts of her testimony are vague. Doc. No. 1-5 at 201-02. She did testify that she could not "recall" filing an alibi notice about Ms. Mason and that "it may have come up at the last minute." Id. Similarly, a review of the trial transcript also demonstrates that she tried to elicit alibi testimony from Ms. Mason. Doc. No. 1-4 at 304 ("Now, you couldn't see Thomas Clardy 24 hours a day at that time, every minute of the evening at that point, you're not trying to say that to the jury?").

[8] On cross-examination of Ms. Mason, the prosecutor asked, "it's your testimony that you know that [Clardy] was home at your house on Buena Vista that whole day and that whole evening?," to which Ms. Mason responded, "[y]es, he was." Doc. No. 1-4 at 308.

18

examination, and never made it into the trial record. *e.g., Stewart v. Wolfenbarger*, 468 F. 3d 338, 355 (6th Cir. 2006); *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). By contrast, it cannot be disputed that Ms. Mason's statement that Petitioner was home all evening made it into the record for the jury to consider. Docket No. 1-4 at 308.

In the instant petition, Clardy contends that the TCCA improperly "suggested" that the jury would not find Ms. Mason believable and independently made a credibility determination. Docket No. 1 at 59. This Court does not read the TCCA's opinion the same way. Rather than making its own credibility determination, the TCCA was merely interpreting trial counsel's testimony at the post-conviction hearing: that trial counsel did not find Ms. Mason credible, and that was the reason she did not file an alibi notice for her. *Clardy*, 2018 WL 5046032, at *5.

Clardy next argues that, based on Judge Norman's instruction to the jury to disregard part of Ms. Mason's testimony on direct examination, we should assume that the jury also disregarded Ms. Mason's alibi testimony that was admitted on cross-examination "without further guidance from the court." Docket No. 1 at 60. Clardy provides no real support for this assumption aside from the following quote from *United States v. Harvey* that "[j]urors are presumed to follow instructions." *Id.* (citing 653 F.3d 388, 396 (6th Cir. 2011)).

In addition to Ms. Mason's alibi testimony that came out on cross-examination, the jury also heard alibi testimony [9] from Ms. Thompson. Clardy contends that Ms. Thompson's testimony was "not an adequate substitute for Ms. Mason's" because Ms. Thompson could not identify the precise time when she saw Clardy, which, according to Clardy, raised the possibility that he had already returned home from the crime scene. Docket No. 1 at 60. Like Clardy's previous

---

[9] Clardy takes issue with TCCA's reference to Ms. Thompson as an alibi witness, which is curious because she was qualified as one in a timely manner and testified as one at trial. Doc. No. 1 at 60.

arguments, this argument ignores the fact that Ms. Mason's testimony was admitted on cross-examination. Practically speaking, then, Ms. Thompson's testimony was not actually substituting for Ms. Mason's testimony. Rather, it supplemented Ms. Mason's testimony.

Finally, Clardy further argues that even if Ms. Mason's and Ms. Thompson's testimony were the same, Ms. Mason's testimony "still would have materially increased the odds of acquittal given that Ms. Thompson's testimony would have corroborated Ms. Mason's, and vice versa." Docket No. 1 at 60. Yet again, this argument continues to make the faulty assumption that Ms. Mason's testimony was never elicited or admitted.

In sum, even if trial counsel's failure to provide alibi notice for Ms. Mason in a timely fashion was deficient performance, the TCCA's determination that it did not prejudice Clardy was not contrary to law and not based on an unreasonable application of the law or an unreasonable finding of facts. This claim is denied.

### C.    Subclaim 3 – Failure to Present Expert Eyewitness Testimony

Clardy next argues that trial counsel was ineffective in failing to present an expert in eyewitness identification. Docket No. 1 at 62. Clardy fully exhausted this claim in state court, and it is properly before the Court on habeas review.

Federal courts have found that an attorney's decision to not present an expert in eyewitness testimony is a tactical one (and thus is not deficient) when trial counsel weighed the benefits and costs to presenting that testimony in light of other evidence and thoroughly challenged the eyewitness's account through other methods, including cross-examination and in opening and closing arguments. *e.g., Watkins v. Trierweiler*, 2020 WL 4192563, at *9-10 (E.D. Mich. July 20, 2020) (denying habeas relief where the state court concluded that trial counsel's decision to rely on cross-examination rather than retaining an expert was within the wide range of reasonable

defense strategies); *Martin v. Horton*, 2018 WL 7508604, at *3 (6th Cir. Dec. 14, 2018); *Jackson v. Bradshaw*, 681 F. 3d 753, 762-63 (6th Cir. 2012) (denying habeas relief where the petitioner contended that eyewitness identifications were "essential" to the prosecution's case); *Dorch v. Smith*, 105 Fed. Appx. 650, 653 (6th Cir. 2004) (failure to call expert witness on eyewitness identification did not constitute constitutionally ineffective assistance of counsel where counsel presented alibi witnesses and cross-examined eyewitnesses).

In the instant case, trial counsel's failure to present an eyewitness expert clearly was not a matter of sound trial strategy. *Compare Watkins*, 2020 WL 4192563, *9-10 (E.D. Mich. July 20, 2020). Trial counsel wanted and actively tried to procure an eyewitness expert without success. Docket No. 1-5 at 194-95. She recognized the importance of presenting an eyewitness expert in Clardy's case both while she prepared for trial and afterwards. *Id.* at 194. Indeed, she repeatedly acknowledged that the "only" evidence that the government had against Clardy was an eyewitness identification, which further underscores her understanding of the importance of an eyewitness expert. *Id.*

Here, as the TCCA rightfully noted on multiple occasions in its opinion and as trial counsel testified, the Defendant's identification was clearly relevant to his criminal culpability and to the punishment he might suffer. In fact, it was the only evidence placing him at the crime scene. Recognizing the importance of this issue, trial counsel determined that an expert witness to challenge the identification was crucial as a "basic tool of an adequate defense." *Ake v.* Oklahoma, 470 U. S. 68, 77 (1985). Nonetheless, counsel failed to obtain or request funding for an expert as allowed by the Supreme Court Rules of Tennessee.

While neither the post-conviction Court nor the Tennessee Court of Criminal Appeals addressed the issue of deficiency, this court finds that the decision of trial counsel not to request

funding for an eyewitness identification expert was deficient. As the TCCA repeatedly noted, "[t]he identification of the perpetrators was the central issue during the investigation and at trial." *Clardy, supra* *1. The TTCA further acknowledged that trial counsel realized "that the only testimony linking petitioner to the crime was the identification by Kent . . . ." *Id.* at *6. Counsel likewiseadmitted that she "should have gotten an expert witness" but "decided to go ahead with it." *Id.*

The TCCA rejected Clardy's claim on prejudice grounds without discussion of deficiency. *Clardy*, 2018 WL 5046032, at *6. To adequately address the TCCA's finding that Clardy failed to establish *Strickland* prejudice, this Court first finds it necessary to address whether trial counsel was deficient, which the Court reviews *de novo*. *See Rayner v. Mills*, 685 F. 3d 631, 638 (6th Cir. 2012). The Court finds that trial counsel was deficient.

At the post-conviction hearing, Clardy offered the testimony of eyewitness identification expert Dr. Jeffrey Neuschatz, who discussed several factors that impact the accuracy of eyewitness identifications that were present in Clardy's case, which the Court briefly summarizes. Docket No. 1-5 at 50-67. First, Dr. Neuschatz testified that one's memory can be faulty in a high-stress situation like a triple shooting. *Id.* at 50, 52-53. Second, he testified that the presence of a firearm would impair one's memory compared to a situation where a firearm was not present. *Id.* at 57-58, 60. Third, Dr. Neuschatz pointed out that is it more difficult to give an accurate cross-racial identification than an identification of a person of the same race. *Id.* at 60-61. Fourth, he testified that head coverings that cover one's hairline make it more difficult to give an accurate identification. *Id.* at 62-63. Fifth, he explained the concept of "unconscious transference." *Id.* at 65-67. Unconscious transference can occur when a victim is familiar with an individual who was at or near a crime scene and the victim mistakes that individual for the person who actually

committed the crime. *Id.* Dr. Neuschatz opined that Clardy potentially suffered from unconscious transference because Kent was familiar with Clardy from Clardy's earlier visit to his shop. *Id.* at 67. In sum, Dr. Neuschatz testified that the foregoing factors were all present when Kent positively identified Petitioner. *Id.* at 60-63, 65-67.

Recognizing that the eyewitness identification was the "only" evidence the government had against Clardy, trial counsel acknowledged at the post-conviction hearing that "she should have gotten an expert witness but [she] decided to go ahead with it." Docket No. 1-5 at 194. Trial counsel then proceeded to explain how she tried but failed to find an expert to testify. *Id.* at 194-95. She testified that she called "everybody" on the Tennessee Association of Criminal Defense Lawyers' list and even looked outside the state for an expert.[10] *Id.* at 195. Despite her efforts, trial counsel was unable to find any expert who Clardy could afford "for what the State of Tennessee was paying" at the time. *Id.* at 195. Trial counsel also blamed the Administrative Office of Courts, which, at the time, she recalled "was not paying expert witness's fees that were being billed." *Id.* at 194-95. However, trial counsel admitted she never actually requested funds from the state. *Id.*

Unlike counsel's other decisions, it cannot be said that this was a strategic decision. While it was certainly a decision, counsel neither articulated nor is there any legitimate strategic reason not to seek funding for an expert counsel believed is critical to the defense. The only reason she did not seek funding was that she did not believe the court would approve it. For these reasons, the Court finds the decision not to request funding for an eyewitness identification expert was deficient.

Because counsel's performance was deficient, the remaining question is whether trial

---

[10] Trial counsel even gave a speaker at a seminar for the Tennessee Association of Criminal Defense Lawyers a ride to the airport to see if the speaker would "come down and take the case." Doc. No. 1-5 at 194.

counsel thoroughly challenged the eyewitness's account through other means at trial such that there was no prejudice. A review of the record indicates that trial counsel attempted to cast doubt on the eyewitness identification and raised at least some of the same concerns that Dr. Neuschatz raised at the post-conviction hearing. The following is this Court's collection of examples in the record of when and how trial counsel attempted to challenge the eyewitness identification:

As to the first factor to which Dr. Neuschatz testified—the impact of a high-stress event on an identification—trial counsel tried to convey the high-stress nature of the shooting. For example, in her closing argument, she suggested that Kent's identification could not be trusted because "he was shot, he was traumatized, he was in pain, he was on medication [afterwards when he spoke to detectives]." Docket No 1-4 at 344. In trial counsel's opening statement, she described that "things happened in a flash," and tried to convey that the identification was made in a high-stress situation. *Id.* at 15.

As to the second factor, she also attempted to raise the presence of weapons and their impact on the reliability of eyewitness identification. *Id.* at 18, 113. For instance, in her opening statement, counsel described Ms. Clouatre as having "a gun in her face, children are there, her husband is dead, shooting is going on, she's looking at the gun, not at the face behind the gun." *Id.* at 18. She similarly pushed the issue in her cross-examination of Kent, suggesting it was odd that he was "alert enough that [he] was able to distinguish the types of guns." *Id.* at 113.
As to the third factor, the Court could not find any clear reference that trial counsel made about the unreliability of a cross-racial identification.

Next, through her cross-examination of Kent and Officer Kerewet, trial counsel repeatedly pointed out that the individuals wore hooded sweatshirts and tried to cast doubt on the fact that Kent actually saw their faces. *Id.* at 112-13, 261. She also pointed out inconsistencies in Kent's

testimony during closing, including that Kent apparently said the individuals had greasy hair despite the fact that he said they wore hoods over their heads. *Id.* at 341.

Trial counsel also implicitly raised what Dr. Neuschatz would later term "post-event memory" during her cross-examination of Kent. *Id.* at 117. For example, she had intimated that Kent gave a positive identification to the police long after the event occurred, and that seeing wanted posters with Clardy's face around the neighborhood reinforced that identification. *Id.* She did the same during her cross-examination of Ms. Clouatre, noting how her recollection and description of events was refined over time. *Id.* at 54-55.

Although trial counsel did not use the term "unconscious transference," she attempted to push the issue during Kent's cross-examination and during her opening statement and closing argument. *Id.* at 17, 343. She repeatedly told the jury that Kent had been familiar with Clardy and knew his face from the neighborhood. *Id.* 17, 343. And finally, throughout trial, trial counsel repeatedly noted the inconsistencies between Ms. Clouatre's recollection of events and Kent's, as well as the inconsistencies in their own recollections over time. *Id.* at 122, 136, 254, 339-40.

Of the several issues that Dr. Neuschatz discussed in the post-conviction hearing, a review of the record reveals that trial counsel did not clearly address one issue—specifically, the impact of a cross-racial identification.

The remaining issue is whether the Petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for counsel's failure to obtain the expert witness in light of trial counsel's performance outlined above. The TCCA, without actually analyzing trial counsel's performance, found there was no prejudice because the expert "could not opine as to the correctness of Kent's identification" and "[m]erely giving a jury more information to consider without negating the identification does not establish a reasonable probability,

sufficient to undermine the outcome, that the result of the proceeding would have been different." *Clardy, supra* at *7.

As an initial matter, the TCCA cites no authority, and this court can find none that an eyewitness identification expert must opine that the identification in question was incorrect. However, none of the case law suggests that an expert witness must make such a determination and it would seem that determination is within the province of the jury who is the finder of fact. Nonetheless, numerous courts have held that a Defendant cannot show prejudice for failing to use an eyewitness identification expert. Especially, where counsel was able to effectively make the same points, an expert would have. *See e. g. Jackson v. Bradshaw,* 681 F. 3d 753, 762-63 (No expert not unreasonable  where attorneys emphasize potential weaknesses in the identifications); *Watkins v. Trierweiler*, 2020 WL 4192563, at *9-10 (E. D. Mich. July 20, 2020) (same). What distinguishes the record however in this case is the universally agreed upon conclusion that as the TCCA found "[t]he identification of the perpetrators was the **central issue** during the investigation and **at trial.**" *Clardy, supra* at *1 (emphasis added).

The compulsory process clause of the Sixth Amendment establishes a right to present a defense, including a right to present witnesses for the defense, and this right is a "fundamental element of due process of law." *Forensic v. Birkett,* 501 F. 3d 469, 475 (6th Cir. 2007)(quoting *Taylor v. Illinois*, 484 U. S. 400, 409 (1988)). While an indigent defendant need not be afforded assistance equal to that of "his wealthier counterpart," it must amount to the "basic tools of an adequate defense." *State v. Barnett*, 909 S. W. 2d 423, 426 (Tenn. 1995)(quoting *Ake v. Oklahoma,* 470 U. S. 68, 77 (1985)).

Under Tenn. R. Sup. Ct. 13, when a Defendant is entitled to appointed counsel, the court may authorize funds for investigative or expert services. Tenn. R. Sup. Ct. 13, § 5(a)(1). In

allocating funding for an expert witness, the court must determine whether the services are "necessary" and what amount is "reasonable." Tenn. R. Sup. Ct. 13, § 5(a)(1). The authorization of funding requires a finding that there is a particular need for the requested services and that the fees charged are reasonable. Tenn. R. Sup. Ct. 13, § 5(c)(1).

In *Ake v. Oklahoma,* the Unites States Supreme Court considered the issue of "whether the constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question." 470 U. S. 68, 70 (1985).

In determining what constituted a "basic tool" of an adequate defense, the Court applied a three-factor balancing test to consider (i) the private interest that will be affected by the State's actions; (ii) the State's interest that will be affected if the safeguard is to be provided; and (iii) the probable value of the additional or substitute procedural safeguards that are sought weighed against the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Ake,* 470 U. S. at 77, *citing Mathews v. Eldridge,* 424 U. S. 319, 335 (1976).

The *Ake* court determined "[t]he private interest and the accuracy of a criminal proceeding that places an individual's life or liberty at risk" is "almost uniquely compelling," and found that "weighs heavily in our analysis." *Ake,* 470 U. S. at 77. The Court then considered the governmental interest affected by the provision's safeguard, and found that the only interest weighing against recognition of the right was the fiscal burden on the state. The Court concluded that fiscal interest is "not substantial, in light of the compelling interest of both the State and the individual in an accurate disposition." *Id.* The Court then determined in the context of the psychiatric assistance sought, that "when the state has made the Defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be

crucial to marshal his defense." *Ake*, 470 U. S. at 82.

Trial counsel is ineffective when she "fails adequately to investigate, and to introduce into evidence information that demonstrates her client's factual innocence or that raises sufficient doubts as to that question, to undermine confidence in the verdict." *Richey v. Bradshaw,* 498 F. 3d 344, 362 (6th Cir. 2007)(quoting *Reynoso v. Giurbino,* 462 F. 3d 1099, 1112 (9th Cir. 2006)). The Supreme Court has acknowledged "the dangers inherent in eyewitness identification," *United States v. Ash*, 413 U. S. 300, 329 (1973)(quoting *United States v. Wade*, 388 U.S. 218, 235 (1967)), and the Sixth Circuit has noted "eyewitness misidentification accounts for more false convictions in the United States than any other factor." *Ferensic v. Birkett,* 501 F. 3d 469, 475 (6th Cir. 2007). In *Ferensic,* the Court explained expert testimony on eyewitness identifications is "universally recognized as scientifically valid and of 'aid [to] the trier of fact' for admissibility purposes." *Id*. at 482. (quoting *United States v. Smithers,* 212 F. 3d 306, 315 (6th Cir. 2006)).

In *Ferensic*, the Sixth Circuit upheld a district court's grant of habeas relief for a Petitioner convicted of armed robbery where the trial court did not allow an eyewitness identification expert to testify on behalf of the Defendant. *Ferensic,* 501 F. 3d at 471, 482-83. The Court's ruling was grounded on the trial's court's refusal to allow the expert to testify, which was deemed a violation of the Defendant's Sixth Amendment right to present a defense. *Id.* at 483. Critical to the ruling in *Ferensic* was the fact that the only evidence against the Defendant was his identification by the married couple victimized by the robbery. *Id.* at 482-83.

As here, in *Ferensic*, the state Court of Appeals' decision affirming the trial court's denial of relief was based solely on a no prejudice determination; namely, that the expert's "testimony was not especially strong, . . . and inconsistency in the victims' identification was otherwise shown." *Ferensic,* 501 F. 3d at 480. (quoting *Ferensic*, 2001 WL 865089 at * 2). The Sixth Circuit

found however that Ferensic was denied the Sixth Amendment right to present a defense by the exclusion of his expert as a defense witness and the contrary decision of the Michigan Court of Appeals was unreasonable. *Ferensic,* 501 F. 3d at 480. The Sixth Circuit then proceeded to analyze whether the state trial court's constitutional error was harmless within the meaning of *Brecht v. Abrahamson*, 507 U. S. 619 (1993). *Id.* at 480-83.

Applying the harmless error standard of *Brecht* that a constitutional error is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict," the Court found that there was "grave doubt" as to whether the exclusion of the expert had "a substantial and injurious effect or influence" on the outcome of Ferensic's trial. *Id.* at 481. The Sixth Circuit noted this was a very close issue and important to the Court's determination was a jury note implicitly reflecting doubts of the jury as to the identification of the perpetrator. *Id.* at p. 483. In fact, the Court in *Ferensic* limited its holding to the situation where the record reflected doubts of the jury as to the identification issue stating that its analysis "should not be read to imply that the exclusion of an eyewitness-identification expert in a state-court criminal trial . . . will always warrant relief on federal habeas corpus review." *Id.* at p. 484. The Court made this finding to distinguish *Ferensic* from "many others in which the erroneous exclusion of an expert witness on eyewitness identification might well be harmless." *Id.* at p. 483. The Court noted two such cases: *Dorch v. Smith*, 105 Fed. Appx. 650, 653 (6th Cir. 2004) (defense counsel's failure to call an expert witness on eyewitness identification did not satisfy *Strickland* because counsel "presented several witnesses who testified as to [the habeas petitioner's] whereabouts on the weekend of the incident" and cross-examined the eyewitness regarding inconsistencies in his identification of the petitioner) and *Tipton v. United States,* 1996 WL 549802, at *1–2 (6th Cir. Sept. 26, 1996) (holding that "any allegedly ineffective assistance" caused by counsel's failure to "hir[e] an expert in eyewitness

identification" did not prejudice the petitioner within the meaning of *Strickland* ). *Id.* at pp. 483-84.

However, those cases share a critical distinction which is as important as the Sixth Circuit's speculation on the jury deliberations: there was evidence of guilt beyond the identification of the Defendant at trial. *See e. g. Dorch, supra* at *1 (in addition to identification, Dorch's pretrial cellmate testified that Dorch admitted to shooting a man in the face during a crack house robbery using a pistol equipped with a potato as a silencer.); *Jackson v. Bradshaw,* 681 F. 3d 753, 763 (6th Cir. 2012)(eyewitness identification "was not the entire basis of the prosecution's case against Petitioner").

Because of Kent's identification of the Petitioner, as in *Forensic,* "the significance of [the expert] testimony cannot be overstated." *Forensic,* 501 F. 3d 482. Without the testimony of the expert, the jury had no basis beyond defense counsel's word to suspect the inherent unreliability of Kent's identification. Importantly, discussing the value of the expert's testimony to *Forensic,* the Sixth Circuit stated the following:

> We agree with the district court that 'other means' of attacking eyewitness identifications do not effectively substitute for expert testimony on their inherent unreliability. This court's decision in *United States v. Smithers,* 212 F. 3d 306 (6th Cir. 2000), provides direct support for the district court's conclusion that the typical methods of 'challeng[ing] inconsistencies' in the eyewitnesses' testimony 'were not an effective substitute' for what Dr. Shulman would have offered.

> In *Smithers,* the majority thoroughly rejected the dissent's contrary argument as follows:

> The Dissent counters by arguing that eyewitness identification experts are not necessary because cross-examination and jury instructions should be tools used in a trial to discredit and flush-out eyewitness testimony. Unfortunately, the Dissent's homage to trial procedures does not extend to expert witness testimony. The same argument can be made for the admission of expert testimony: cross-examination and jury instructions can be used to question the qualifications of the proffered expert, undermine the basis of the expert's theories, explain the limits of social science's validation studies and pick apart research methods. The only reason given by the Dissent for why cross-examination and jury instructions can serve these

goals for eyewitness testimony, but not for expert testimony, is that the jury may take the expert's testimony as 'scientifically irrefutable truth.' The Dissent's selective faith in the collective intelligence, common sense and decision-making ability of the jury is disheartening, and is also inconsistent with the Dissent's deference to the jury on other matters, including judging the credibility of eyewitness identifications.

*Ferensic*, at 481-482 (quoting *Smithers*, 212 F. 3d at 316).

The Court can find no reason as to why the rationale in *Ferensic* is not equally applicable to the instant case. Based upon the TCCA's repeated findings that Kent's identification was the central issue at trial and given the well-established and well-reasoned authority from the Sixth Circuit Court of Appeals, the failure to present expert testimony undermines the Court's confidence in the trial's outcome. *Foster v. Lockhart*, 9 F. 3d 722, 728 (8th Cir. 1993). Having determined that Petitioner has established both deficiency and prejudice, he is entitled to Habeas relief on this claim.

**D.     Subclaim 4 – Trial Counsel Failed to Effectively Impeach the Photo Lineups**

Clardy next argues that trial counsel was ineffective because she failed to effectively impeach the photo lineups conducted with Kent and Melissa Clouatre. Docket No. 1 at 64. Clardy has baked several subclaims into this one, including that trial counsel failed to mention the improprieties related to Kent's identification from the photo lineup, that counsel did not know that Ms. Clouatre failed to positively identify Clardy in the photo lineup, and that counsel failed to impeach Detective Satterfield's prior misconduct. *Id.* at 64-67. Respondent, on the other hand, argues that Clardy's claim is procedurally defaulted and barred from review. Docket No. 12 at 16-17. Respondent notes that Clardy tried to raise this claim in his post-conviction appeal, but the TCCA found that the claim had been waived. *Id.* at 16. Indeed, the TCCA determined that the claims had been "waived" because they "were not presented in the numerous petitions filed in this case nor were these claims argued at the post-conviction hearing." *Clardy*, 2018 WL 5046032, at

*7.

In response, Clardy argues that the claim had not been waived because the post-conviction court failed to consider it despite Clardy having had incorporated the claim by reference from his *pro se* petition into the TCCA Operative Amended Petition. Docket No. 18 at 14. Additionally, Clardy contends that he described the impropriety with the photo lineup during the post-conviction hearing. *Id.* Further, Clardy maintains that even if this Court finds that the photo lineup claims were "waived," any procedural default should be excused for two reasons: (1) Clardy has established gateway actual innocence, and in the alternative, (2) Clardy received ineffective assistance of post-conviction counsel. *Id.*

This Court's extensive review of the record revealed the following sequence of events, which suggest that parts of this subclaim were either "waived" or unexhausted. Clardy first filed a *pro se* petition for post-conviction relief in December 2009 in which he argued that trial counsel rendered ineffective assistance of counsel. Docket No. 10-14 at 44-50. In that original *pro se* petition, Clardy contended that trial counsel was ineffective for several reasons. *Id.* Two of those reasons were that trial counsel failed to impeach the "highly suggestive" photo lineup and separately, that trial counsel failed to explore prior misconduct of Detective Satterfield. *Id.* at 48-49 (claims 8 and 9 of the *pro se* petition). In 2016, after multiple intervening amendments, Petitioner filed the TCCA Operative Amended Petition with the assistance of counsel. The TCCA Operative Amended Petition expressly incorporated all the grounds for relief asserted in Mr. Clardy's *pro se* petition. Docket No. 10-16 at 327.

After the post-conviction hearing, in May 2017, the post-conviction court published its order denying Clardy's petition for post-conviction relief. Docket No. 1-2. The post-conviction court's order only addressed the claims raised in the TCCA Operative Amended Petition and did

not address any claims presented in Clardy's original *pro se* petition, including the claims about the "highly suggestive" photo lineup and the failure to impeach Detective Satterfield about his past conduct. *Id.*; Docket No. 10-14 at 48-89. On June 9, 2017, in a subsequent hearing after the decision was rendered, Clardy's post-conviction counsel moved the post-conviction court to rule on the claims from Clardy's original *pro se* complaint. Docket No. 10-19 at 8. The court denied the motion summarily without explanation. *Id.*

Clardy subsequently appealed to the TCCA. Clardy's appeal included the following two claims which are relevant to this analysis (among others): that counsel failed to impeach Detective Satterfield's testimony effectively, including about the allegedly improper photo lineup, and counsel was unaware that Ms. Clouatre had identified a different suspect when she was presented a photographic lineup. Docket No. 10-21 (subclaims E and G). Clardy's appeal to the TCCA did not mention trial counsel's failure to impeach Detective Satterfield's prior misconduct.

To recap, the relevant claims in Clardy's *pro se* petition were: (i) trial counsel's failure to impeach the photo lineups, which were "highly suggestive," and (ii) her failure to explore prior misconduct of Detective Satterfield. Docket No. 10-14 at 48-89. Meanwhile, Clardy's appeal to the TCCA stated the following claims: (i) that counsel failed to impeach Detective Satterfield's testimony effectively, particularly about the photo lineup, and (ii) that counsel was unaware that Ms. Clouatre had identified a different suspect when she was presented a photographic lineup. Docket No. 10-21. And in the instant Petition before the Court, Clardy has again asserted that trial counsel failed to effectively impeach the photo lineup but has expanded the claim beyond what was presented in the state courts.[11] *Id.* at 64-67.

---

[11] As mentioned above, Clardy has baked in several further subclaims into this subclaim, including that trial counsel failed to mention the improprieties related to Kent's identification from the photo lineup, that counsel did not know that Ms. Clouatre failed to positively identify Clardy in the photo

In light of the above, this Court finds that the only part of this subclaim that was neither waived nor exhausted was trial counsel's failure to impeach the photo lineups—specifically as it related to Kent—which was raised in Clardy's *pro se* petition and on appeal to the TCCA. Nonetheless, having reviewed the transcript of Kent's testimony, there is no question that it was vigorously examined. The court cannot conclude that trial counsel was ineffective for failing to cross examine Kent regarding the speculation that there might have been some impropriety in the photo identification by Kent.

The claim that trial counsel failed to impeach Detective Satterfield about his prior misconduct was not raised on appeal before the TCCA, and therefore has not been fully exhausted in the state courts. *See* 28 U.S.C. § 2254(b)(1)(A), (B); *McCray v. Horton*, 2022 WL 16645278, at *2 (6th Cir. May 31, 2022) ("A federal court cannot grant a habeas petition for a state prisoner unless the prisoner exhausts his claims by presenting them to the courts at each level of the state judicial system or the state's corrective process is unavailable or ineffective.") (citation omitted).

And the claim raised for the first time in Clardy's appeal, that counsel was unaware that Ms. Clouatre had identified a different suspect in the photo lineup, was neither raised in Clardy's *pro se* petition nor in the TCCA Operative Amended Petition that was before the post-conviction court. It was presented for the first time to the TCCA. Therefore, the TCCA was correct in finding this claim to be "waived."

### E.      Subclaim 5 – Failure to Adequately Investigate the Crime Scene, Including the Blood Trail

Next, Clardy contends that trial counsel was ineffective in failing to conduct an adequate

---

lineup, and that counsel failed to impeach Detective Satterfield's prior misconduct. Id. at 64-67. As the Court reasons above, only the first subclaim within the subclaim, that trial counsel failed to raise the improprieties related to Kent's identification, were properly exhausted in the state courts.

investigation of the crime scene, which would have drawn trial counsel's attention to a blood trail belonging to Kent leading away from the crime scene. Docket No. 1 at 69. The TCCA denied relief on this claim finding that Clardy failed to establish deficient performance and prejudice. *Clardy*, 2018 WL 5046032, at *5. This Court has determined that this subclaim has not been fully exhausted in the state courts and therefore will not consider its merits for the following reasons.

Clardy argues that the TCCA's application of *Strickland* was unreasonable because it erroneously focused on trial counsel's decision to forgo testing the blood trail rather than her failure to identify the blood trail in the first place. Docket No. 18 at 17. In the instant petition before this Court, Clardy alleges that trial counsel's purported failure to review colorized crime scene photos indicates that she failed to adequately investigate the crime scene and that she was unaware of the blood trail. Docket No. 1 at 69-70.

Despite Clardy's current allegation, Clardy presented a different argument to the TCCA in its post-conviction appeal. Docket No. 10-21 at 48-49 (arguing only that it was ineffective representation "to not test" the blood trail and making no clear mention that trial counsel was unaware of the blood trail). Unlike the instant petition, Clardy did not argue before the TCCA that trial counsel failed to conduct an adequate investigation of the crime scene or was unaware that the blood trail existed, and instead framed the issue as trial counsel's failure to test the blood trail. Docket No. 10-21 at 48-49 (explaining that trial counsel "elected" to forgo testing the blood trail, suggesting she was aware it existed). Additionally, unlike the instant petition, Clardy's appeal to the TCCA made no mention of trial counsel's review (or lack thereof) of colorized photos of the crime scene, which, in the petition before this Court, provides grounds for inferring that trial counsel did not know about the blood trail and therefore failed to conduct an adequate investigation. Docket No. 10-21 at 48-49.

It is this Court's opinion that failing to test the blood trail is not the same argument as failing to conduct an adequate investigation of the entire crime scene. The TCCA, therefore, did not err by focusing only on the testing of the blood trail because that is the argument that Clardy presented it with. Because Clardy has raised a new, "separate and distinct" theory in the instant petition that has never been presented to the state courts, the Court finds that Clardy has not exhausted his available state remedies for this argument. *See* 28 U.S.C. § 2254(b), (c); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is presented in federal court.") (citations omitted). Further, because Clardy does not even argue that he can show cause and prejudice, the Court finds that he has procedurally defaulted this claim.

### F.  Subclaim 6 – Trial Counsel Failed to Adequately Cross-Examine Kent Clouatre About the Drug Evidence

Clardy next argues that trial counsel was ineffective because she failed to adequately cross-examine Kent Clouatre about his and his brother's involvement in illegal drugs. Docket No. 1 at 72. In Clardy's view, this would have provided trial counsel with two things: (1) another avenue to impeach Kent's testimony that he did not know drugs were present in the body shop, and (2) a motive for the shooting—a drug dispute. *Id.* Clardy fully exhausted this claim in state court, and it is properly before the Court on habeas review. The Court finds that the TCCA's decision constituted a reasonable application of the clearly established standard.

The TCCA found trial counsel's failure to cross-examine Kent about his involvement in drug dealing was neither deficient performance nor prejudicial to Clardy. *Clardy*, 2018 WL 5046032, at *6. It reasoned:

> At the post-conviction hearing, trial counsel divulged that her strategy was to steer clear of any mention of drugs at trial. She stated, "I found out that the victim and his surviving twin were dealing drugs out of the auto shop . . . I didn't want

[Clardy] associated in the jurys' (sic) minds with drugs." She further explained, "Back in 2007 here is a young black male, with a predominately white jury, and to hear the word drugs[,] I was afraid that was all they were going to hear." "I made a conscious decision tactically because I did not want [Clardy] associated in any way with the drug business," she added when speaking about a different piece of testimony.

*Id.* at *6.

In response, Clardy argues that trial counsel's decision to deemphasize the drug evidence was not an informed choice based on a sufficiently thorough investigation and points to her post-conviction hearing testimony that she did not "look into" impeaching the Clouatre's about their use of drugs. Docket 1 at 73.

Despite this, the Court finds that the TCCA's decision constituted a reasonable application of *Strickland*. Based on trial counsel's post-conviction hearing testimony, it was reasonable for the TCCA to conclude that trial counsel conducted an adequate investigation insofar as she discovered that the Clouatre's were dealing drugs, and based on that investigation, exercised reasonable professional judgment not to underscore it in Clardy's defense given risks that she perceived at the time to Clardy's defense and credibility in the eyes of the jury. Docket No. 1-5 at 205-06 ("I didn't trust the jury to look at him and not automatically assume, well, he must be involved in a drug deal with these people. And if these people are dealing drugs and they are having their own little spats and fights, what is to exclude him from being there?"). In other words, based on this testimony, the TCCA reasonably construed her decision to be a strategic one under *Strickland*. *Clardy*, 2018 WL 5046032, at *6.

Moreover, that trial counsel did not "look into" impeaching the Clouatre's about their drug use does not necessarily mean she rendered ineffective assistance or that the TCCA's opinion was an unreasonable application of *Strickland*. Docket 1 at 73. As previously discussed, trial counsel explained why she did not "look into" this line of impeachment—she did not want to underscore

drug dealing or drug use at trial at all as she considered it to be risky to Clardy's defense. Docket No. 1-5 at 205-06. Instead, she chose to impeach the Clouatre's testimony in other ways, which this Court explained at length in its analysis of subclaim 3, trial counsel's alleged failure to hire an eyewitness expert.

In light of the above, the TCCA's finding that trial counsel's performance was a matter of trial strategy was neither unreasonable nor "beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### G.      Subclaim 7 – Cumulative Error

Finally, Clardy claims that trial counsel was ineffective due to her cumulative errors. Docket No. 1 at 74-76. The Sixth Circuit has held that a cumulative error claim is not a proper basis for habeas relief post-AEDPA. *See Moore v. Parker*, 425 F. 3d 250, 256-57 (6th Cir. 2005). Where all assertions of error "are all essentially meritless, [a petitioner] cannot show that the cumulative error of [his trial attorney] rendered [them] ineffective." *Seymour v. Walker* 224 F. 3d 542, 557 (6th Cir. 2000). Based upon the findings herein, there are no reviewable errors to cumulate and thus petitioner is not entitled to relief on this claim. *See Getsy v. Mitchell*, 495 F. 3d 295, 317 (6th Cir. 2007)(*en banc*). Therefore, Clardy is not entitled to habeas relief based on cumulative error. *See Id.*

### V.      Clardy's Actual Innocence Claim

Clardy next argues that he is entitled to habeas relief because he is actually innocent of the crimes of which he was convicted. Docket No. 1 at 76. As Clardy acknowledges in his petition, the Sixth Circuit recognizes that freestanding claims of actual innocence are not cognizable on federal habeas review outside of the capital-case context. *See Herrera v. Collins*, 506 U. S. 390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993); *Cress v. Palmer*, 484 F. 3d 844, 854-55 (6th Cir.

2007). This is not a capital case, and therefore the claim is not cognizable.

Clardy also relies on a gateway actual innocence claim, which is different from a freestanding actual innocence claim. Typically, gateway innocence claims enter the picture when there is an underlying constitutional claim (e.g., ineffective assistance of counsel claim), but the state courts found the claim to be procedurally defaulted as a matter of state law. A petitioner may avoid the procedural bar and the requirement to show cause and prejudice by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), such as when the petitioner presents new evidence of his actual innocence. *Hodges v. Colson*, 727 F. 3d 517, 530 (6th Cir. 2013). Thus, as a gateway claim, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404. Since the Court has found two of Clardy's ineffective assistance of counsel claims—subclaim 5 and parts of subclaim 4—have been procedurally defaulted, if Clardy can make out a claim of gateway innocence, the procedural defaults may be excused. *See Id.*

To prevail on his gateway innocence claim, Clardy must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Thornton v. Forshey*, 2021 WL 5276758,  at \*3 (6th Cir. Nov. 12, 2021) (quoting *Schlup v. Delo*, 513 U. S. 298, 324 (1995)). Upon such a showing, a reviewing habeas court must then "consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U. S. 518, 538 (2006) (internal quotation marks omitted). In doing so, "the federal court [must]

assess how reasonable jurors would react to the overall, newly supplemental record," which if the "new evidence so requires, . . . may include consideration of the credibility of the witnesses presented at trial." *Id.* at 538-39 (internal quotation marks omitted).

Then, based on the total record, the reviewing habeas court must make a probabilistic determination about what reasonable jurors would do. *Id.* at 538 (citation omitted). Only if Clardy shows "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," *Schlup*, 513 U.S. at 327, may a court permit his underlying constitutional claim to pass through the gateway and review it on the merits. This probability standard "does not require absolute certainty about the petitioner's guilt or innocence," *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (citation omitted). But it also "does not merely require a showing that a reasonable doubt exists in the light of the new evidence." *Schlup*, 513 U.S. at 329. The barrier to relief is significant: Clardy must show that "no reasonable juror would have found the defendant guilty." *Id.* Both the Supreme Court and the Sixth Circuit have emphasized this gateway is to be applied only in the "extraordinary case" because "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." *Id.* at 321, 324.

"[T]enable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U. S. 383, 386 (2013). A valid claim requires a petitioner to support allegations of constitutional error with new reliable evidence. *Schlup v. Delo,* 513 U. S. 298, 324 (1995). Here, the petitioner has failed to establish through new evidence the merit of any of his procedurally defaulted claims. As such, habeas relief is not warranted to those claims as discussed herein.

## VI. CONCLUSION

For the reasons stated herein, the undersigned recommends that the petition for writ of

habeas corpus be **GRANTED** with respect to petitioner's claim of ineffective assistance of counsel for the failure to request or obtain an eyewitness identification expert and that petitioner's remaining claims be **DENIED.**

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

**JEFFREY S. FRENSLEY**
**United States Magistrate Judge**