IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| THOMAS E. CLARDY, | ) |
| Petitioner, | ) ) ) |
| v. | ) ) No. 3:19-cv-01098 ) Judge Aleta A. Trauger |
| ZAC POUNDS, Warden,[1] | ) ) |
| Respondent. | ) ) |

## MEMORANDUM

Thomas E. Clardy, a person in the custody of the Tennessee Department of Correction ("TDOC"), has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging the constitutionality of his 2006 conviction in the Criminal Court for Davidson County, Tennessee for murder, attempted murder, and reckless endangerment. (Doc. No. 1.) Following referral under Rule 72 of the Federal Rules of Civil Procedure, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that the petition be granted based on one of the grounds for relief asserted by the petitioner. (Doc. No. 25.)

Now before the court are the respondent's Objections to the R&R (Doc. No. 28), urging the court to reject the Magistrate Judge's ruling as it relates to the sole claim for relief that he found to be meritorious. Clardy filed a Response to the respondent's Objections (Doc. No. 32), and he

---

[1] The court takes judicial notice that Zac Pounds was recently appointed Warden of Riverbend Maximum Security Institution, where petitioner Clardy is incarcerated. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Pounds is automatically substituted as the defendant in this action.

also filed his own Objections and supporting Memorandum (Doc. Nos. 29, 30), challenging the Magistrate Judge's rejection of the other claims for relief set forth in his habeas petition. The respondent has filed a Response in opposition to the petitioner's Objections. (Doc. No. 33.)

As set forth herein, the court will accept and adopt the Magistrate Judge's ruling in its entirety, except as modified herein, overrule the respondent's Objections, and grant the petitioner's § 2254 petition.

**I.     STANDARD OF REVIEW**

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court must review *de novo* any portion of the report and recommendation to which a proper objection is made. Fed. R. Civ. P. 72(b)(1)(C); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). In conducting its review of the objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

Substantively, Clardy's petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a federal court may not grant a habeas petition unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). In addition, where the state court decided a claim on the merits, a federal district court may grant relief only if the state court's resolution of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d). This standard, on which the petitioner bears the burden of proof, is "difficult to meet" and "highly deferential," and it "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). A district court's review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

A state court's decision is "contrary" to federal law, for purposes of § 2254(d)(1), if it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" of federal law occurs under § 2254(d)(1) when a state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13. "[T]he central inquiry is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008)).

The Sixth Circuit has held that, "[w]ith respect to § 2254(d)(2), '[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Ayers*, 623 F.3d at 308 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)). This standard is "demanding but not insatiable." *Id.* (citation omitted).

## II.   THE RESPONDENT'S OBJECTIONS

### A.   Background

In an attempt to avoid duplication of effort to the extent possible, the court presumes familiarity with the underlying state court record, the habeas petition, the government's response, and the R&R itself. In summary, the habeas petition asserts claims for relief based on six separate instances of ineffective assistance of counsel ("IAC"), as well as a claim that the cumulative prejudicial effect of counsel's alleged errors warrants setting aside the state court judgment. The petitioner also states claims based on actual innocence: both a freestanding actual innocence claim and a "gateway innocence" claim. (Doc. No. 1, at 77.)

The Magistrate Judge recommends granting relief only on the basis of the petitioner's third IAC claim: that trial counsel's assistance was constitutionally deficient, insofar as she failed to present expert testimony on eyewitness identifications and that the petitioner was prejudiced by that failure, particularly in light of the fact that the only inculpating evidence presented at trial was victim Kent Clouatre's eyewitness identification of Clardy as the individual who shot and killed Kent's brother, Kirk Clouatre. (*See* Doc. No. 1, at 62–64; Doc. No. 25, at 20–31.) It is undisputed that this claim was fully exhausted in the state court proceedings.

The well known standard governing the initial review of IAC claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this standard, a petitioner seeking to prove that he had ineffective assistance of counsel at trial must demonstrate (1) constitutionally deficient performance by his trial counsel; and (2) actual prejudice resulting from that deficient performance. *Id.* at 687, 694. To show deficient performance, the petitioner must show that his attorney's performance "fell below an objective standard of reasonableness," based on "prevailing professional norms." *Id.* at 688. The prejudice component requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Under AEDPA, however, the standard for a review of an IAC claim asserted in the context of a § 2254 motion is not merely whether a petitioner can establish deficient performance and prejudice under *Strickland*, but whether the state court properly applied *Strickland*—whether its decision rejecting his original IAC claim "(1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court' or (2) 'was based on an unreasonable determination of the facts.'" *Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (quoting 28 U.S.C. § 2254(d)); *see also Richter*, 562 U.S. at 105 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). In other words, this court must give the state court decision "double deference." *Rogers*, 69 F.4th at 389.

At the same time, however, when a state court's ruling relies "only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012). Instead, the federal court applies *de novo* review to the unadjudicated *Strickland* element. *Id.*; *see also Smith v. Cook*, 956 F.3d 377, 392 n.4 (6th Cir. 2020) (recognizing that this holding in *Rayner* "remains the law of our circuit"), *rehearing en banc denied* (June 15, 2020).

The Tennessee Court of Criminal Appeals ("TCCA"), in addressing the IAC claims raised in the petitioner's post-conviction petition, correctly cited the *Strickland* standard. *Clardy v. State*, No. M2017-01193-CCA-R3-PC, 2018 WL 5046032, at *2 (Tenn. Ct. Crim. App. Oct. 17, 2018). The court also correctly observed that, while a petitioner is required to prove both elements to

prevail on an IAC claim, "a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Id.* (quoting *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996), and citing *Strickland*, 466 U.S. at 697). When the TCCA considered the plaintiff's IAC claim arising from trial counsel's failure to call an eyewitness expert, it addressed only the element of prejudice. *See id.* at *6 ("The State contends that Petitioner was not prejudiced by trial counsel's failure. We agree with the State."). Finding no prejudice, it did not consider whether trial counsel's performance was deficient under *Strickland*.

Regarding prejudice, responding to the petitioner's assertion that a jury hearing the information provided by Dr. Jeff Neuschatz, an expert in psychology who testified at the post-conviction hearing, would have reached a different conclusion, the court stated:

> We disagree. Dr. Neuschatz could not opine as to the correctness of Kent's identification. Merely giving a jury more information to consider without negating the identification does not establish a reasonable probability, sufficient to undermine the outcome, that the result of the proceeding would have been different.

*Id.* at *7.[2]

Clardy argued in his post-conviction appellate brief, and he argues in his § 2254 petition here, that his counsel's failure to procure an expert on eyewitness identification amounted to constitutionally deficient performance and that he was prejudiced by that failure. He further argues here that "any reasonable determination of the facts . . . compels the conclusion that Mr. Clardy received constitutionally ineffective assistance of counsel."

---

[2] The post-conviction court likewise concluded only that the petitioner was not "prejudiced by trial counsel's failure to utilize an expert in eyewitness identification," in light of Kent Clouatre's testimony that he "knew the defendant." (Doc. No. 10-16, at 54.) Kent Clouatre, to be clear, did not have a personal relationship with Clardy, but he professed to recognize Clardy a few minutes after he first arrived at the shop from having seen him around the neighborhood and knew him by the nickname "T." (*See* Trial Tr. Vol. I, Doc. No. 10-2, at 79, 80, 81, 110.) He also testified that the individual was wearing a hooded sweatshirt and moving quickly and that he only really saw the side of his face. (*Id.* at 99.)

With respect to this particular claim, the Magistrate Judge agreed. After summarizing the underlying events, examining in some detail the procedural history of the case, and setting forth the correct legal standards, the Magistrate Judge applied *de novo* review to the question of whether counsel's performance was deficient and found that it was. The Magistrate Judge also found the state court's determination that Clardy was not prejudiced by that deficiency to be unreasonable, particularly in light of the fact that the only evidence remotely inculpating Clardy in this case was the eyewitness identification, such that the "significance of [the expert] testimony cannot be overstated," and without which "the jury had no basis beyond defense counsel's word to suspect the inherent unreliability of Kent [Clouatre's] identification." (Doc. No. 25, at 30 (quoting *Ferensic v. Birkett*, 501 F. 3d 469, 482 (6th Cir. 2007)).)

The respondent raises a number of challenges to the Magistrate Judge's recommendation that relief be granted on the basis of this claim. Regarding the prejudice prong, he argues that the state court's conclusion that the petitioner failed to establish prejudice was not unreasonable—more particularly, that it was not "contrary to," and did not "involve[] an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." (Doc. No. 28, at 3 (quoting 28 U.S.C. § 2254(d)(1)).) He argues that there is no Supreme Court precedent on this issue, which, he asserts, further demonstrates the reasonableness of the decision. He also contends that the Magistrate Judge erred in appearing to rely on *Ake v. Oklahoma*, 470 U.S. 68, 70 (1985), and *Ferensic v. Birkett* to grant relief, in particular because *Ake* simply held that, in that particular case, the petitioner had a due process right to funding for a psychiatric expert, and *Ferensic*, besides being factually distinguishable, does not qualify as "clearly established federal law, as determined by the Supreme Court." (*Id.* at 5.) He asserts, in sum, that the issue before the court is only whether "any fairminded jurist [could] have concluded under the state-court record

that Petitioner failed to prove prejudice" and that the answer to that question is clearly yes. (*Id.* at 8.)

Regarding deficiency, the respondent asserts that the court need not consider this prong if it finds no prejudice, but he also concedes that, if the court does reach it, *de novo* review applies to this element of the *Strickland* analysis. (*Id.* at 9.) Based on that standard, the respondent argues that the Magistrate Judge erred in finding deficient performance, first, because "[n]o precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment" (*id.* at 10 (quoting *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011)).) The respondent points to counsel's testimony that she attempted to find an expert but was unsuccessful in finding one the petitioner could afford or who would "work for the fee that the State paid for expert witnesses working for indigent clients" and that she did not request funding for an expert, because she "wanted to have one lined up before [she] did." (*Id.* at 10–11 (quoting or citing Post-Conviction Hearing Transcript ("PC Hr'g Tr.") 193–95.[3])

Second, the respondent also argues that counsel could not have filed a motion for funding *until* she found a willing expert, citing Tennessee Supreme Court Rule 13 § 5(b)(2)(B), and that she cannot be deemed deficient for failing to file a motion that would have been denied.

Third, the respondent argues that, even if Dr. Neuschatz had been available, it is not clear that counsel would have hired him or that his testimony would have persuaded the jurors to

---

[3] The two-volume Post-Conviction Hearing Transcript is in the record in two places: at Doc. No. 1-5 and at Doc. Nos. 10-17 (Volume I) and 10-18 (Volume II). The court refers herein to the transcript using the original pagination assigned by the court reporter, rather than to the pagination assigned by the court's electronic filing system.

disregard eyewitness testimony, pointing to trial counsel's testimony that some juries she had dealt with "would have hated him." (Doc. No. 28, at 11 (quoting PC Hr'g Tr. 222).)

### B. Discussion

#### 1. *Deficient Performance*

The court accepts and incorporates herein in its entirety the Magistrate Judge's assessment of trial counsel's constitutionally deficient performance. As the Magistrate Judge notes, trial counsel herself recognized that Kent Clouatre's eyewitness identification was effectively the *only* evidence the government had against Clardy, and she acknowledged at the post-conviction hearing that she "apparently should have gotten an expert witness." (PC Hr'g Tr. 194.) She tried but failed to procure an expert whom Clardy could afford or who would accept "what the State of Tennessee was paying" at the time. (*Id.* at 195.) She blamed the Administrative Office of the Courts for "not paying expert witness's fees that were being billed." (*Id.* at 193–94.) However, she also admitted that she never actually requested funding from the state in any amount. (*Id.* at 195.)

Thus, as the Magistrate Judge found, counsel's failure to procure an expert witness, despite her recognition of the need for one, was not a strategic decision. To the contrary, she recognized the importance of challenging Clouatre's eyewitness testimony. Counsel never articulated a reason, nor can the court imagine one, for failing to locate and seek funding for an expert whose testimony counsel believed to be critical to the case. Rather, she did not seek funding because she did not believe it would be approved.

Given that (1) eyewitness testimony was the only inculpating evidence in the case; and (2) counsel herself believed the testimony of an expert on eyewitness identification to be of critical importance to the case but failed to make the necessary efforts to procure such testimony, including by seeking funding and, if necessary, postponing the trial to give her time to procure both an expert and the necessary funding, counsel's performance fell below that reasonably necessary to defend

her client, in the particular circumstances presented by this case. (*See* Doc. No. 25, at 23.) Counsel repeatedly referenced problems with the Administrative Office of the Courts to excuse her failure, but she made no attempt to overcome or circumvent the problems.

The respondent also argues that the Sixth Circuit has stated that "[n]o precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment." (Doc. No. 28, at 10 (quoting *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011)).) *Perkins*, however, is an unreported opinion in which the court also recognized that "there [wa]s nothing about th[at] case suggesting that such a witness was imperative here." *Id.* It does not appear that defense counsel recognized the necessity of an eyewitness expert but failed to procure one or that an expert testified at the post-conviction hearing as to the problems inherent in the eyewitness testimony presented in that case. In addition, unlike here, other evidence implicated the petitioner, including that he was arrested immediately after the crime near the scene and had attempted to evade police, and an accomplice already in custody had tried to signal him. *Id.* at 825. Thus, the court's conclusion that counsel in *Perkins* was not deficient for failing to call an eyewitness expert does not dictate the outcome here.

The respondent also insists that counsel must be granted "wide latitude" in making tactical decisions, citing *Harrington v. Richter*, 562 U.S. 86, 106 (2011), but, as discussed above, counsel did not make a strategic or tactical decision—she simply failed to do something she herself believed was important to her client's case. This case, therefore, is distinguishable from those cases in which counsel was deemed not ineffective for affirmatively choosing to forego an eyewitness identification expert. Moreover, even *Richter* recognized that "[c]riminal cases will arise where

the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Id.* at 106.

This case is also distinguishable from those holding that there is no constitutional right to an expert on eyewitness identification. Clardy is not claiming a constitutional right to an eyewitness expert; he is relying on his constitutional right to the effective assistance of counsel. The Sixth Circuit and the Supreme Court have both recognized "the dangers inherent in eyewitness identification." *Jackson v. Bradshaw*, 681 F.3d 753, 762–63 (6th Cir. 2012) (quoting *United States v. Ash*, 413 U.S. 300, 329 (1973)). Counsel in this case was objectively unreasonable in not pursuing an expert and funding for such an expert, where "the only reasonable and available defense strategy require[d] . . . introduction of [such] expert evidence." *Richter*, 562 U.S. at 106.

Regarding the argument that counsel would not have been able to seek funds *until* she found an expert willing to take the case, under Tennessee Supreme Court Rule 13 § 5, the respondent has never before raised this issue. The Sixth Circuit has repeatedly recognized that arguments "raised for [the] first time in objections to [a] magistrate judge's report and recommendation are deemed waived." *Morgan v. Trierweiler*, 67 F.4th 362, 367 (6th Cir. 2023) (quoting *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000)).[4] Regardless, this argument is without merit, because the petitioner's attorney did not affirmatively testify that she could not find an expert at all—rather, it appears that she could not find one who would accept a fee in the amount she *thought* the court would approve. And nothing but counsel's speculation suggests that such a motion would not have been approved. The Rule itself provides for the "payment or reimbursement of reasonable and necessary expenses." Tenn. S. Ct. Rule 13 § 5(a)(1).

---

[4] The government also never raised this argument in the state courts, but the "exhaustion" requirement pertains only to a habeas petitioner's claims, not to the government's position as to those claims.

Finally, the respondent argues that, even if Dr. Neuschatz had been available, it is not clear that trial counsel would have hired him. This argument is a red herring. The fact that Dr. Neuschatz testified at the post-conviction hearing does not necessarily mean that he would have testified at the trial—though his willingness to testify at the post-conviction hearing further supports the inference that trial counsel could have found him, or someone, if she had looked hard enough.[5] As a result, counsel's speculation that trial counsel (or jurors) might have been put off by Dr. Neuschatz's demeanor neither excuses counsel's failure to procure an eyewitness expert nor detracts from the potential prejudice to her client's case caused by the absence of such an expert, as discussed below.

The respondent takes issue with the Magistrate Judge's conclusions that (1) trial counsel did not make a strategic decision not to seek funding for an expert she believed was critical to the defense and (2) the only reason trial counsel did not seek funding was because she did not think the court would approve it. The respondent has not shown that either conclusion was erroneous. To be sure, "*Strickland* ordinarily does not require defense counsel to call any particular witness." *United States v. Nolan*, 956 F.3d 71, 82 (2d Cir. 2020). "But under the unusual circumstances presented here"—in particular that the only actually inculpating evidence was one individual's eyewitness testimony and that his testimony was subject to nearly all of the factors identified in the scientific literature, discussed below, as adversely affecting eyewitness identifications— "counsel could not render effective assistance without input from an expert." *Id.* Under the specific

---

[5] Dr. Neuschatz's Curriculum Vitae, introduced as an exhibit at the post-conviction hearing, indicates that Dr. Neuschatz has been on the faculty at the University of Alabama in Huntsville since 2000 and has been publishing on the topic of memory since 1996. (Doc. No. 10-20, Ex. 3.)

facts of this case, counsel's failure to procure an expert to testify about the potential fallibility of eyewitness identifications fell below the reasonable standard of care.

    2.     *Prejudice*

          *a)*     *The State Appellate Court's Decision Involved an Unreasonable Application of Strickland*

Under *Strickland*, the TCCA was tasked with determining whether prejudice resulted from the petitioner's attorney's failure to obtain expert testimony—that is, whether that error was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This standard does *not* require a petitioner to show that the attorney's error "more likely than not altered the outcome in the case." *Id.* at 693. Rather, the petitioner must show only that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In other words, a showing of prejudice does not require exculpatory evidence or even evidence that, if believed, would necessarily result in an acquittal.

In this case, Dr. Neuschatz testified at the post-conviction hearing about how memory works generally and, more specifically, in the context of eyewitness identifications. He testified that, when something happens quickly and in a stressful situation, memories of that event will be more fragile and susceptible to error; that exposure time affects the accuracy of memory; that memory deteriorates over time; that cross-racial identifications are particularly prone to error; that, when a weapon is present, people tend to focus on the weapon rather than on the face of the person wielding it, thus impairing their ability to later accurately recall that face; that head coverings dramatically affect the accuracy of identification; and that unconscious transference can cause a

person to conflate memories of events that happen close in time. (*See* PC Hr'g Tr. 50–66.) He explained unconscious transference as follows:

> Unconscious transference is basically that if someone is around or near the scene at the time of a crime who looks like the person who committed the crime, they can be transferred [in the witness's memory] and be thought of as the person who actually committed the crime when they weren't.

(*Id.* at 65–66.) Dr. Neuschatz also testified that a person's confidence in his memory says nothing about its actual accuracy, and he testified that *all* of the factors he discussed were present in the identification of Clardy by Kent Clouatre in this case—including that the event was very stressful, happened very quickly, involved multiple firearms, that the shooter was a Black man (Clouatre is White) and was wearing a hooded sweatshirt that partially covered his face, that Clouatre recognized Clardy from having seen him around the neighborhood, and that he did not positively identify him from a photographic array until several weeks after the shooting—could have affected the accuracy of Clouatre's identification. (*Id.* at 60–70.) He also testified that Clouatre's confidence in his identification of Clardy had little correlation with the accuracy of his memory. (*Id.* at 69.)

Clardy's post-conviction brief highlighted Dr. Neuschatz's testimony and asserted that this information would have substantially assisted the trier of fact if it had been presented to the jury. (Doc. No. 10-21, at 63.) The petitioner argued that Dr. Neuschatz's testimony "establishes the value of an eye witness expert," where the "only real evidence against Mr. Clardy was the eye witness testimony of Kent Clouatre," and that any reasonable jury would have reached a different conclusion if it had heard the expert testimony. (*Id.* at 65.) The trial court rejected this argument and the TCCA affirmed, stating only, as set forth above, that it disagreed with the assertion that a jury hearing Dr. Neuschatz's testimony would have reached a different conclusion, because:

> Dr. Neuschatz could not opine as to the correctness of Kent's identification. Merely giving a jury more information to consider without negating the identification does not establish a reasonable probability, sufficient to undermine the outcome, that the result of the proceeding would have been different.

*Clardy,* 2018 WL 5046032, at *7.

The court finds that this conclusion is contrary to, and involved an unreasonable application of, *Strickland*, which constitutes clearly established federal law as determined by the Supreme Court, for purposes of 28 U.S.C. § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"). Although the TCCA paid lip service to *Strickland*'s "reasonable probability" language, *Strickland*, 466 U.S. at 694, it appeared to interpret "prejudice" to require that the proposed expert testimony affirmatively negate evidence already in the record, and it unreasonably concluded that simply giving the jury "more information to consider," without negating the existing evidence, could never change a jury's verdict. As the petitioner asserts in his Response to the Respondent's Objections, in a case where the only evidence against the petitioner was a single individual's eyewitness testimony, requiring him to negate that evidence in order to prove prejudice effectively meant that only evidence of actual innocence would have satisfied the standard. Such a requirement is contrary to *Strickland*. (*See* Doc. No. 32, at 16 ("Here, . . . the TCCA required Mr. Clardy to affirmative '*negat[e]*' the only evidence of his guilt the State had offered at trial.").)

Moreover, "giving a jury more information" is exactly the point. An expert's job is not to opine on the credibility of a specific witness's testimony, and the trial court would have properly rejected any effort by a testifying expert to offer an opinion on the validity of any specific witness's testimony. Rather, the very purpose of his testimony would have been to cast doubt on the

reliability of Kent Clouatre's eyewitness identification; without that testimony, the jury was given no reason to discount the identification.

The TCCA clearly did not assess the effect of an attorney's error in light of the totality of the circumstances, as required by *Strickland*:

> [A] court hearing an ineffectiveness claim must consider *the totality of the evidence* before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Strickland*, 466 U.S. at 695–96 (emphasis added). Applying *Strickland* here would have required the court to acknowledge that the verdict was "weakly supported by the record," making it all the more likely that expert evidence challenging the eyewitness testimony—again, the only evidence placing Clardy at the scene of the crime—would have an effect on the verdict.

Even if Clardy's lawyer attempted during trial to cast doubt on the validity of Kent Clouatre's identification, a lawyer's statements are not evidence and cannot substitute for expert testimony. The Sixth Circuit, in fact, has acknowledged that expert testimony on eyewitness identifications is "universally recognized as scientifically valid and of 'aid [to] the trier of fact' for admissibility purposes." *Ferensic v. Birkett*, 501 F.3d 469, 482 (6th Cir. 2007). As in *Ferensic*, the potential significance of eyewitness expert testimony in this case "cannot be overstated," given the absence of any other evidence inculpating the petitioner in this case and the fact that "'other means' of attacking eyewitness identifications [can]not effectively substitute for expert testimony on their inherent unreliability." *Id.*

The court finds, in sum, that the TCCA unreasonably applied *Strickland* when it required the proffered expert testimony to "negate" Kent Clouatre's testimony.

### b) *This Court's* De Novo *Review*

Because the state court's application of *Strickland* was unreasonable, this court conducts a *de novo* review of the question of prejudice, under *Strickland.* And applying that standard, largely for the same reasons referenced above, the court finds that there is *more* than a reasonable probability that, but for counsel's failure to obtain expert testimony on eyewitness identification, the result of the proceeding would have been different. 466 U.S. at 694. Because the evidence of conviction in this case was exceedingly weak, the likelihood that an expert's testimony challenging eyewitness identification would "alter[] the outcome in the case" is very strong indeed. *Id.* at 693.

The Sixth Circuit has recognized that "many aspects of perception and memory are not within the common experience of most jurors, and in fact, many factors that affect memory are counter-intuitive." *United States v. Smithers*, 212 F.3d 306, 316 (6th Cir. 2000). In addition, "research . . . indicates that neither cross-examination nor jury instructions on the issue are sufficient to educate the jury on the problems with eyewitness identification." *State v. Copeland*, 226 S.W.3d 287, 300 (Tenn. 2007). And here, aside from the fact that Kent Clouatre's eyewitness identification was the only inculpating evidence against Clardy, the State did not object to Dr. Neuschatz's qualifications as an expert, and his testimony at the post-conviction hearing established that all of the factors he identified as potentially undermining the reliability of such identifications were present here. *Accord United States v. Nolan*, 956 F.3d 71, 80 (2d Cir. 2020) (holding that the defendant was prejudiced by counsel's failure to effectively contest eyewitness identification where the identification, like that here, was potentially affected by factors including the presence of head coverings, "weapon focus," the "high stress" of the events, the cross-racial nature of the identification, and the time that elapsed between the events and the identification). Thus, no matter what efforts trial counsel exerted in trying to impeach Clouatre's identification through other means, only an expert's testimony could show that "the eyewitness testimony was

sufficiently unreliable in ways not readily apparent to a lay jury." *Id.* That is, the testimony of Dr. Neuschatz or a similar expert would have offered "a scientific, professional perspective" that no other witness provided, and it would have "informed the jury of *why* the eyewitness[] identification[] [was] inherently unreliable." *Ferensic*, 501 F.3d at 477.

Such evidence would have been particularly helpful in this case, where copious evidence in the record establishes numerous inconsistencies in Kent Clouatre's testimony, as well as inconsistences between his testimony and that of Melissa Clouatre, Kirk Clouatre's wife. In particular, Kent Clouatre stated that all three suspects were wearing hooded sweatshirts (Trial Tr. Vol. I, Doc. No. 10-2, at 112–13) and that the man who shot his brother in particular—whom he did not initially recognize—was trying "to hide his identity by wearing a hood, running into the shop really quick." (*Id.* at 99.) Clouatre claims he did not recognize the shooter until he turned to the side and Clouatre saw "the side of his face." (*Id.*) This is the individual he later identified as Clardy. But police records indicate that Clouatre also told police that the shooter had "small braids" and tattoos. (Trial Tr. Vol. II, Doc. No. 10-3, at 46.) Thomas Clardy has never had any tattoos. (Doc. No. 10-2, at 162–63.) Contrary to Kent, Melissa testified, and repeatedly told police, that the shooter was wearing a white t-shirt, had something white on his head, and had "fuzzy hair," "frizzy hair," or an afro. (*Id.* at 65, 133, 159.) She was never able to identify Clardy in a line up or in person as the shooter. Although Kent testified at trial, consistently with Melissa's testimony, that the shooter was driving a dark Taurus, the detectives' notes indicate that he initially described the car as an '87 Buick Sentry, and later as a "bluish gray '84, '86 model Buick." (*Id.* at 136; Trial Tr. Vol. II, Doc. No. 10-3, at 45.)

Given this conflicting testimony and a record otherwise devoid of inculpatory evidence, there is a reasonable probability that an eyewitness expert's perspective would have led at least

one juror to strike a different balance when considering Clardy's guilty and the reliability of Kent Clouatre's identification. *Strickland* prejudice requires nothing more. *See Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020) ("[P]rejudice . . . requires only a reasonable probability that at least one juror would have struck a different balance."). *Strickland* prejudice in this case is abundantly clear.

The court, therefore, will overrule the respondent's Objections to the R&R and accept the Magistrate Judge's recommendation that Clardy's § 2254 petition be granted on the grounds that (1) his trial counsel was objectively deficient for failing to obtain an expert on eyewitness identifications, and (2) the Tennessee Court of Appeals incorrectly and unreasonably applied *Strickland* when it concluded that the petitioner was not prejudiced by that failure.

### III. THE PETITIONER'S OBJECTIONS

Having concluded that the petitioner is entitled to relief on the grounds discussed above, the court will grant his petition, thus rendering moot the plaintiff's Objections to the Magistrate Judge's ruling on the other issues raised in the petition.

### IV. CONCLUSION

For the reasons discussed above, the court will overrule the respondent's Objections and grant Clardy's Petition for Writ of Habeas Corpus. (Doc. No. 1.)

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge