# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **THOMAS E. CLARDY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:19-cv-01098** |
| | ) | **Judge Aleta A. Trauger** |
| **KENNETH NELSEN, Warden,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Thomas E. Clardy, a person in the custody of the Tennessee Department of Correction ("TDOC"), filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition"), challenging the constitutionality of his 2006 conviction in the Criminal Court for Davidson County, Tennessee for murder, attempted murder, and reckless endangerment. (Doc. No. 1.) Following referral under Rule 72 of the Federal Rules of Civil Procedure, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that the Petition be granted based solely on Clardy's third ineffective assistance of counsel ("IAC") claim: that trial counsel's assistance was constitutionally deficient, insofar as she failed to present expert testimony on eyewitness identifications and that the petitioner was prejudiced by that failure, particularly in light of the fact that the only inculpating evidence presented at trial was victim Kent Clouatre's eyewitness identification of Clardy as the individual who shot and killed Kent's brother, Kirk

---

[1] The court takes judicial notice of the fact that Kenneth Nelsen is now Warden of Riverbend Maximum Security Institution, where petitioner Clardy is incarcerated. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk shall substitute Nelsen as the respondent in this case.

Clouatre. (*See* Doc. No. 1, at 62–64; Doc. No. 25, at 20–31.) The R&R recommended denying relief on the other grounds raised in Clardy's Petition. (Doc. No. 25 at 41.)

Both the petitioner and the respondent filed Objections to the R&R. The respondent's Objections (Doc. No. 28) urged the court to reject the Magistrate Judge's ruling as it relates to the sole claim for relief that the Magistrate Judge found to be meritorious. Clardy's Objections and supporting Memorandum (Doc. Nos. 29, 30) challenged the Magistrate Judge's rejection of the other claims for relief set forth in his Petition.

In June 2023, this court issued a Memorandum and Order accepting and adopting the Magistrate Judge's ruling, with slight modifications, overruling the respondent's Objections, and granting the Petition. (Doc. Nos. 34, 35.) Because the court concluded that Clardy was entitled to relief on his third IAC claim, the court found that his objections to the Magistrate Judge's ruling on the other issues raised in his Petition were moot. (Doc. No. 34 at 19.) The court ordered that Clardy be released from custody unless the State of Tennessee afforded him a new trial within 180 days of the date of the Order. (Doc. No. 35.) After a hearing on October 20, 2023, the court ordered that Clardy be released immediately, pending the state's appeal. (Doc. No. 54.)

The Sixth Circuit reversed and remanded in January 2025. Following the denial of Clardy's petition for a writ of certiorari, this court granted the state's Motion to Revoke Order Releasing Petitioner Pending Appeal and denied Clardy's Motion to Continue Release with Conditions Pending Resolution of Remaining Habeas Claims. (Doc. No. 84.) As a result, Clardy went back into state custody and remains there. The Sixth Circuit having reversed this court's ruling on Clardy's third IAC claim, however, Clardy's Objections to the R&R are no longer moot, and this court must now consider them.

Before undertaking that endeavor, the court takes judicial notice of the fact that, in February 2026, the Tennessee Board of Parole recommended to Governor Bill Lee that Clardy be exonerated, based in large part on a Davidson County Assistant District Attorney's testimony that her office has no confidence in the conviction and is in possession of evidence tying other suspects to the crime. Governor Lee has not yet acted on the Board of Parole's recommendation, but this court remains convinced that the evidence in the record, on its face, is exceedingly weak, giving ample cause to question the reasonableness of the jury verdict and the validity of the conviction.

Those questions, however, are not before the court, and this court has no power to grant a habeas petition simply on the strength of its own view of the inadequacy of the evidence. What remains before this court are simply the plaintiff's other arguments in support of his Petition— arguments the Magistrate Judge rejected and that this court had no reason to reach in its previous ruling, having found relief warranted on the grounds recommended by the Magistrate Judge.

Regrettably, given the strictures imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the court finds that the petitioner is not entitled to relief on any of the other grounds set forth in his habeas petition.

## I.     STANDARD OF REVIEW

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court must review *de novo* any portion of the report and recommendation to which a proper objection is made. Fed. R. Civ. P. 72(b)(1)(C); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). In conducting its review of the objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

Substantively, Clardy's petition is governed by 28 U.S.C. § 2254, as amended by AEDPA.

Under AEDPA, a federal court may not grant a habeas petition unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). In addition, where the state court decided a claim on the merits, a federal district court may grant relief only if the state court's resolution of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d). This standard, on which the petitioner bears the burden of proof, is "difficult to meet" and "highly deferential," and it "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). A district court's review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

A state court's decision is "contrary" to federal law, for purposes of § 2254(d)(1), if it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" of federal law occurs under § 2254(d)(1) when a state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13. "[T]he central inquiry is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008)).

The Sixth Circuit has held that, "[w]ith respect to § 2254(d)(2), '[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Ayers*, 623 F.3d at 308 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)). This standard is "demanding but not insatiable." *Id.* (citation omitted).

## II.  BACKGROUND

Thomas Clardy was convicted by a Davidson County Jury in 2007 on six counts: one count of intentional and premeditated murder; two counts of attempted murder; and three counts of reckless endangerment. *State v. Clardy*, No. M2007-02729-CCA-R3-CD, 2009 WL 230245, at *1 (Tenn. Crim. App. Feb. 2, 2009). By operation of law, Clardy was sentenced to life imprisonment for the murder conviction. Tenn. Code Ann. § 39-13-208(c) (2003). He was sentenced to fifteen years on counts two and three and two years on counts four through six, with those sentences to run concurrently with each other and concurrently with the life sentence. *Clardy*, 2009 WL 230245, at *1. After his motion for judgment of acquittal or a new trial was denied, Clardy filed a timely notice of appeal, challenging the sufficiency of the evidence to support the convictions.

Clardy's conviction was based almost entirely on the eye-witness testimony of victim Kent Clouatre—testimony that conflicted in several respects with statements he initially gave police and that was largely uncorroborated by the only other eye witness, victim Kirk Clouatre's wife, Melissa Clouatre. The Tennessee Court of Appeals, viewing all of the evidence in the light most favorable to the state, nonetheless affirmed the conviction. *Id.* at *13, 14.

Clardy filed a timely *pro se* motion for post-conviction relief in the state court and, once counsel was appointed, an amended petition raising additional issues. He sought relief on the basis

of several claims of ineffective assistance of counsel, cumulative error, and actual innocence. On appeal, he also argued that the post-conviction court erred in refusing to allow him to introduce into evidence a photograph of an alternative suspect. The trial court denied his post-conviction petition and the appellate court affirmed, finding that Clardy failed to establish that trial counsel was deficient or that he was prejudiced by any of the deficiencies alleged in his brief; that newly discovered ballistic evidence, though exculpatory, did not prove his innocence by clear and convincing evidence; and that, although the trial court had erred in refusing to admit into evidence a photograph of an alternative suspect, the error was harmless. *Clardy v. State* ("*Clardy II*"), No. M2017-01193-CCA-R3-PC, 2018 WL 5046032, at *9 (Tenn. Ct. Crim. App. Oct. 17, 2018), *permission to appeal denied* (Tenn. Apr. 12, 2019).

Clardy thereafter filed his Petition for relief under § 2254 in this court in December 2019,[2] asserting the following claims (in addition to the IAC claim already addressed by this court and rejected by the Sixth Circuit):

---

[2] The court takes judicial notice of the fact that Clardy filed a petition for a writ of error *coram nobis* in state court in December 2020, while his Petition was pending in this court. He alleged newly discovered evidence calling into question his participation in the crimes for which he was convicted. *Clardy v. State*, No. M2021-00566-CCA-R3-ECN, 2022 WL 2679026, at *1 (Tenn. Ct. Crim. App. July 12, 2022). He acknowledged that his *coram nobis* petition was filed outside the statute of limitations but claimed entitlement to equitable tolling. The State agreed, but the *coram nobis* court found that it was not bound by the State's concession and dismissed the petition as untimely. *Id.* The State (now represented by the Office of the Tennessee Attorney General rather than by the Office of the Davidson County District Attorney) pivoted on appeal, arguing that the *coram nobis* petition was untimely and that Clardy was not entitled to equitable tolling. *Id.* at *5. The Tennessee Court of Criminal Appeals agreed with Clardy that equitable tolling should be applied, *id.* at *7, but the Tennessee Supreme Court reversed, holding that, for equitable tolling of the *coram nobis* statute of limitations, (1) "the petition must present newly discovered evidence of actual innocence of the underlying crime"; and (2) the newly discovered evidence, "if true, establish clearly and convincingly that the petitioner is actually innocent of the underlying crime of which he was convicted." *Clardy v. State*, 691 S.W.3d 390, 402–03, 407 (Tenn. 2024). Finding that Clardy did not meet that standard, the Tennessee Supreme Court denied his petition.

1. Trial counsel was ineffective for failing to investigate or request ballistics testing of firearms evidence found at the crime scene.

2. Trial counsel was ineffective for failing to properly notice the alibi testimony of Roylessha Mason.

3. Trial counsel was ineffective for failing to effectively impeach the integrity of the photo lineup procedures that police conducted with Kent and Melissa Clouatre.

4. Trial counsel was ineffective for failing to identify or investigate a blood trail found at the crime scene.

5. Trial counsel was ineffective for failing to effectively cross-examine Kent Clouatre about drug evidence.

6. Trial counsel's numerous errors cumulatively prejudiced the petitioner.

7. The totality of the evidence establishes Clardy's actual innocence of the crimes of conviction.

(*See* Doc. No. 1.) The R&R recommends denying relief on each of these claims. Clardy's Objections to that portion of the R&R are now before the court, and the court reviews each of his remaining claims *de novo*.

## III. DISCUSSION

### A. IAC Claims

The well known standard governing the *initial* review of IAC claims by a state court is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this standard, a petitioner seeking to prove that he had ineffective assistance of counsel at trial must demonstrate (1) constitutionally deficient performance by his trial counsel; and (2) actual prejudice resulting from that deficient performance. *Id.* at 687, 694. To show deficient performance, the petitioner must show that his attorney's performance "fell below an objective standard of reasonableness," based on "prevailing professional norms." *Id.* at 688. The prejudice component requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Under AEDPA, however, the standard for a review of an IAC claim asserted in the context of a § 2254 petition is not merely whether a petitioner can establish deficient performance and prejudice under *Strickland*, but whether the state court properly applied *Strickland*—whether its decision rejecting his original IAC claim "(1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court' or (2) 'was based on an unreasonable determination of the facts.'" *Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (quoting 28 U.S.C. § 2254(d)); *see also Richter*, 562 U.S. at 105 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). In other words, this court must give the state court decision "double deference." *Rogers*, 69 F.4th at 389.

At the same time, however, when a state court's ruling relies "only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012). Instead, the federal court applies *de novo* review to the unadjudicated *Strickland* element. *Id.*; *see also Smith v. Cook*, 956 F.3d 377, 392 n.4 (6th Cir. 2020) (recognizing that this holding in *Rayner* "remains the law of our circuit").

The Tennessee Court of Criminal Appeals ("TCCA"), in addressing the IAC claims raised in the petitioner's post-conviction petition, correctly cited the *Strickland* standard. *Clardy II*, 2018 WL 5046032, at *2. The court also correctly observed that, while a petitioner is required to prove both elements to prevail on an IAC claim, "a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one

component." *Id.* (quoting *Goad v. State,* 938 S.W.2d 363, 370 (Tenn. 1996), and citing *Strickland,* 466 U.S. at 697).

> 1.      *Trial Counsel's Failure to Investigate or Request Ballistics Testing of Firearms Evidence Found at the Crime Scene*

Clardy argues that trial counsel was ineffective for failing to request ballistics testing of shell casings collected at the crime scene that would have identified viable alternative suspects. (Doc. No. 1 at 51.) As he explained, when the shell casings were tested years later, they matched guns used in two other crimes that took place after those for which Clardy was convicted but before his trial, committed by two cousins, Thomas and Dantwan Collier. (*Id.* at 3.) Dantwan Collier has physical characteristics similar to those of the shooter, as described by victim Kent Clouatre in his police statements. (*Id.*) Clardy argues that he was obviously prejudiced by this error, given the problems with Kent Clouatre's identification of him and the dearth of any other evidence linking him to the crimes of conviction.

Clardy raised this claim in the TCCA, and it is fully exhausted. The TCCA ruled as follows in addressing this claim:

> The State contends that trial counsel's choice to eschew ballistics testing was a tactical decision because the State had no evidence, other than eyewitness testimony, tying Petitioner to the crime scene. Accordingly, trial counsel chose to forego any scientific testing that might possibly inculpate Petitioner. Additionally, the State asserts that it is unclear how trial counsel would have prepared differently for Petitioner's case if she [had] known that the cartridge casings in this case matched guns used in two other shootings less than a year later. We agree with the State's assessment of trial counsel's tactical decision.
>
> With regard to the description of the suspects, Officer Quirouette recalled [victim] Melissa [Clouatre] giving different heights and weights for each suspect and changing the number of suspects from four to three. At one point, Kent [Clouatre] gave police the name "Darrell." Melissa's notes contained the name "Darrell" as well. During an interview, Melissa identified an individual from a photographic lineup that was not Petitioner.
>
> Pursuant to an agreed order entered by the post-conviction court in November of 2015, Bridget Chambers, a forensic firearms examiner with the Metro Nashville

Police Department, reexamined cartridge casings of three different calibers that were recovered from the crime scene. Upon reexamination, she discovered a match for the two .40 Smith and Wesson caliber cartridge casings. Ms. Chambers matched those casings to a Glock 23 handgun that was used in a July 5, 2006 crime by an individual named Dantwan Collier, who had "gold teeth." Additionally, Ms. Chambers matched the two 9mm cartridge casings recovered from the crime scene to other 9mm cartridge casings that were found at the scene of a January 5, 2006 homicide involving Dantwan Collier's cousin, Thomas Collier. Finally, Ms. Chambers matched the .380 auto cartridge case to a Hi-Point pistol chambered in .380 auto that had been used in a 2006 case. No explanation was given for the significance of the match of the .380 auto cartridge.

Prior to Petitioner's trial in July of 2007, trial counsel did not request any ballistics testing in Petitioner's case. Trial counsel explained, ". . . . The ballistics, nobody had tied – nothing had been tied to [Petitioner.]" Trial counsel did not recall a weapon being associated with Petitioner and did not recall Petitioner having any prior convictions for possession of a firearm. Had trial counsel known that the ballistics from the cartridge casings would match weapons used in two other crimes prior to trial, she "probably" would have used that information as part of Petitioner's defense.

The post-conviction court found that trial counsel's decision to decline ballistics testing of the cartridge casings recovered from the crime scene was not deficient performance. The post-conviction court attributed to hindsight Petitioner's argument that an alternate suspect could have been developed from ballistic testing. The post-conviction court surmised that ballistics results linking the recovered cartridge casings to a gun used by another person would not necessarily rule out Petitioner's involvement in the crime because there were three suspects.

Like the post-conviction court, we recognize that hindsight is always twenty-twenty. Now that ballistics testing has been conducted, revealing exculpatory evidence, it is easy to look back at trial counsel's decision to forego ballistics testing with a critical eye. However, if the ballistics testing had revealed a match to a firearm registered to Petitioner, then Petitioner would have had abysmal chances of prevailing at trial. We evaluate trial counsel's actions from the attorney's perspective at the time, and at the time there was no physical evidence linking Petitioner to the crime scene. At the time that she was preparing for trial, there was a chance that ballistics testing might reveal either exculpatory or inculpatory evidence. Rather than take a risk, trial counsel made the tactical decision to play it safe and argue that Kent's identification, the only thing linking Petitioner to the crime, was inaccurate and incorrect. As the United States Supreme Court has recognized,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on

> investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.
>
> *Strickland*, 466 U.S. at 690-91. At the time that trial counsel decided to forego ballistics testing, she made a reasonable decision. Therefore, we decline to hold that trial counsel's representation was deficient.

*Clardy II*, 2018 WL 5046032, at *3–4 (emphasis added) (internal quotation marks and one citation omitted).

Clardy argues that the TCCA's determination that trial counsel's decision to forego ballistics testing was a legitimate "tactical decision" was unreasonable and unsupported by the record—first, because there is no indication that trial counsel ever reviewed or investigated the pretrial ballistics testing that police conducted at all and, second, because, even if she had conducted an adequate investigation, "[t]rial counsel's explanation that she was concerned about 'the ballistics testing . . . reveal[ing] a match to a firearm registered to Mr. Clardy' is nonsensical. No firearm has *ever* been registered to Mr. Clardy, nor does he have any prior firearm-related convictions." (Doc. No. 1 at 54 (quoting *Clardy II*, ))) at *4).) Clardy asserts that counsel's testimony was all the more puzzling in light of the fact that Clardy has maintained his innocence all along and that counsel believed him, which should have obviated any concern that ballistics testing could have turned up evidence unfavorable to the defense. (*Id.*) Clardy also argues at length that the failure was clearly prejudicial, since the identification of Thomas and Dantwan Collier as alternative suspects, their criminal histories, Dantwan's physical resemblance to Kent Clouatre's description of the shooter, and other evidence in the record all supported a conclusion that Kent Clouatre had misidentified Clardy as the shooter. (*Id.* at 55–58.)

A court applying *Strickland* must "'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct,' and 'judicial scrutiny of counsel's performance must be highly deferential[.]'" *Neill v. United States*,

937 F.3d 671, 676 (6th Cir. 2019) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000)). But, as set forth above, a court reviewing a state court's application of *Strickland* asks only whether "the state court's decision was both 'contrary to' and an 'unreasonable application of' clearly established law from the Supreme Court." *Rogers*, 69 F.4th at 389 (quoting 28 U.S.C. § 2254(d)(1)).

Here, the court is admittedly troubled by the TCCA's justification of counsel's "tactical" decision on the basis that, "if the ballistics testing had revealed a match to a firearm registered to Petitioner, then Petitioner would have had abysmal chances of prevailing at trial." *Clardy II*, 2018 WL 5046032, at *4. As Clardy points out, there is no evidence in the record that any firearm had ever been registered to him, and counsel conceded during the post-conviction hearing that he had no prior convictions relating to the possession of a firearm and "there never was any gun associated with him that would have matched the ballistics." (*See* Post-Conviction Hr'g Tr. 197, Doc. No. 10-18 at 73.)

At the same time, counsel clearly explained during the post-conviction hearing that she did not seek ballistics testing because, at the time, no ballistics testing tied Clardy to the shootings, and she wanted to emphasize the sparsity and conflicting nature of the eye-witness evidence the state had against him. (*See* Post-Conviction Hr'g Tr. 196, Doc. No. 10-18 at 72 ("It came down to the surviving twin's identification of Thomas, . . . and I focused on him saying to Detective Satterfield that the shooter had tattoos on his hands.").) Given that testimony, this court cannot find that the TCCA unreasonably applied *Strickland* in finding that trial counsel's decision was a reasonable strategic decision entitled to deference. *See Clardy II*, 2018 WL 5046032, at *4 ("Rather than take a risk, trial counsel made the tactical decision to play it safe and argue that

Kent's identification, the only thing linking Petitioner to the crime, was inaccurate and incorrect."). Because that determination was reasonable, the court does not reach the question of prejudice.

While the issue presents a close call, particularly with the benefit of hindsight, the court finds that Clardy is not entitled to relief on this ground.

> 2. *Trial Counsel's Failure to Effectively Present Alibi Evidence Including by Failing to Properly Notice the Alibi Testimony of Roylessha Mason*

At trial, Clardy called his then-wife, Roylessha Mason, to testify in his defense. (Trial Tr. 297.)[3] As soon as she began testifying, the State objected and requested a bench conference, during which the prosecutor stated that the witness was "getting dangerously close to giving an alibi." (*Id.* at 299.) Counsel for Clardy explained that she had provided a notice of alibi for a different witness and that Mason would not actually be able to provide an alibi because she "was on bedrest" and "can't say whether he was there or not." (*Id.*) She indicated, somewhat vaguely, that the purpose of the witness was to "establish that he's where he was prior to the time that he was to give him a face." (*Id.*) She also indicated that she would steer the witness away from providing an alibi. However, at one point during Mason's testimony, Mason stated unequivocally that Clardy "never left" the house and "stayed playing a [video] game" even after her friend Shakisha Thompson came to pick up her son to take him out bowling for the evening. (*Id.* at 304.) The State objected, and the trial court instructed the jury to "disregard that last statement made by the witness. That is opinion evidence and she is not allowed to give opinion evidence." (*Id.* at 304–05.) Mason was nonetheless permitted to testify, immediately afterward, that Thompson brought her son home around 11:00 or 11:30 and that Clardy answered the door. (*Id.*) Moreover, a few minutes later, on cross-examination, the prosecutor asked Mason: "And it's your testimony that you know that

---

[3] The trial transcript is in the court's record at Doc. Nos. 10-2 (Trial Tr. 1–164) and 10-3 (Trial Tr. 165–398).

Thomas, or you think Thomas was home at your house in Buena Vista that whole day and that whole evening?" to which Mason responded, "Yes, he was." (*Id.* at 308.) Mason was also asked whether she saw her son leave with Shakisha Thompson, and Mason clarified that she saw her friend before they left but did not see her when she brought her son home later that evening. However, she knew when Thompson brought her son home, because Thompson "called [Mason] when she got outside and [Mason] sent Thomas [Clardy] to the door." (*Id.* at 309.) In other words, Mason clearly provided alibi evidence during cross-examination by the prosecutor, to which no objections were lodged.

Clardy argued in post-conviction proceedings that his trial counsel was ineffective for failing to give notice that she would call Mason as an alibi witness. The TCCA did not squarely address the question of deficient performance, but it rejected this claim on the basis that the petitioner could not establish prejudice, since essentially the same alibi evidence came in on cross-examination, and the petitioner could not show that "more specific testimony from Ms. Mason providing an alibi would have changed the outcome of the trial." *Clardy II*, 2018 WL 5046032, at *6. The court also recognized that Shakisha Thompson, for whom counsel did provide notice, was able to testify as an alibi witness. *Id.* at *5.

In his Petition in this court, Clardy posits several reasons why the TCCA's determination that he was not prejudiced by counsel's failure to notice Mason as an alibi witness was incorrect and insists that the exclusion of Mason's testimony was "devastating to his defense." (Doc. No. 1 at 60.) He also argues that trial counsel's error was compounded by her failure to "present evidence of the distance and travel time between the crime scene and Mr. Clardy's home," which would have made it virtually impossible for Clardy to have been at the crime scene shortly before Melissa

Clouatre's 10:48 p.m. 911 call and to have gotten home by 11:00, when Thompson returned Mason's son to their house. (*Id.* at 61.)

The Magistrate Judge rejected this claim, finding that the record supported a conclusion that trial counsel chose not to introduce Mason as an alibi witness because she did not deem her credible and, more importantly, that the TCCA reasonably concluded that Clardy was not prejudiced by the decision.

The petitioner objects that the respondent has forfeited any argument as to the reasonableness of the decision not to identify Mason as an alibi witness prior to trial and that, in any event, the decision, if a strategic one, was not remotely reasonable. He also argues that, even though the prosecutor elicited alibi testimony from Mason on cross-examination, he was still prejudiced, because that testimony came merely minutes after the judge had instructed the jury to disregard her response to defense counsel's questioning on the same topic. He maintains that "the jury likely would not have believed they could consider testimony the court had just told them to disregard" and that "[n]o rational juror would have believed that improper 'opinion evidence' offered on direct examination somehow transformed into something different, which Ms. Mason was 'allowed to give,' just because she tried to offer it again, minutes later, on cross." (Doc. No. 30 at 13.) He asserts that a jury is presumed to follow a judge's instructions and that "jury instructions, once delivered, need not be specifically repeated each time they become relevant to retain their force." (*Id.* (first citing *Key v. Rapelje*, 634 F. App'x 141, 150 (6th Cir. 2015); and then citing *U.S. ex rel. Logan v. Chandler*, 999 F. Supp. 2d 1047, 1077-78 (N.D. Ill. 2013)).)

The state court did not address the question of deficiency, and this court, applying *Strickland* directly, finds that counsel's decision not to file an alibi notice as required by the applicable rules fell below an objective standard of reasonableness. *Accord, e.g.*, *Clinkscale v.*

*Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (finding "nothing reasonable about failing to file an alibi notice within the time prescribed by the applicable rules when such failure risks wholesale exclusion of the defense" and that counsel's failure to do so in that case "fell below an objective standard of reasonableness").

In *Clinkscale*, the Sixth Circuit also found, on *de novo* review under *Strickland*, that the petitioner was prejudiced by his counsel's failure, as it precluded not just one but several potential alibi witnesses from testifying at all. *See id.* at 445 ("Had even one alibi witness been permitted to testify on Clinkscale's behalf, Clinkscale's own testimony would have appeared more credible because it coincided in important respects with those of his alibi witnesses. Without any corroborating witnesses, however, Clinkscale's testimony "left him without any effective defense." (alterations, quotation marks, and citations omitted)).

Here, however, Mason was allowed to testify, and Thompson's alibi evidence corroborated Mason's, so the facts are very different from those in *Clinkscale*. Moreover, unlike in *Clinkscale*, the court does not review the prejudice prong under *Strickland*.[4] Instead, this court reviews the state court's prejudice finding under the deference required by AEDPA. And, in short, the court finds that the state court's determination was not unreasonable. While, as the petitioner argues, a jury may be presumed to follow a judge's instruction to disregard particular testimony in response to a particular question, the jury in this instance was likely as baffled by the judge's initial instruction as Mason was. (*See* Trial Tr. 305 ("Q. Did you understand what the Judge just said? A. No, I don't.").) Further, there is no reason to presume that a jury will disregard later testimony—

---

[4] In *Clinkscale*, the court found that the petitioner had raised, and thus exhausted, his IAC claim in state court, but "no state court ha[d] adjudicated the merits" of that claim. *Clinkscale*, 375 F.3d at 436. As a result, the Sixth Circuit reviewed the claims *de novo*, rather than under the "deferential standard of review set forth in section 2254(d)." *Id.*

related though not identical—that it is not expressly instructed to disregard. As the respondent argues, the evidence was properly before the jury, and there was no need for the jury to disregard it. (Doc. No. 33 at 6.) The petitioner's "assertion that the jury would have relied on the trial court's previous ruling on the State's objection to disregard evidence that the State later elicited is wholly speculative, and it does not demonstrate that the state court's rejection of the claim was unreasonable." (*Id.*) Based on the evidence in the record, the state court reasonably determined that Mason "essentially presented an alibi for Petitioner on cross-examination when she stated that Petitioner was at home with her the 'whole day' and 'whole evening' of the crime." *Clardy II*, 2018 WL 5046032, at *6. Her testimony, as the state court found, was corroborated by Thompson, who was presented as an alibi witness. *Id.* These conclusions—like the conclusion that the petitioner "failed to show that more specific testimony from Ms. Mason providing an alibi would have changed the outcome of the trial," *id.*—were not unreasonable.

The petitioner is not entitled to relief based on this claim.

3.      *Trial Counsel's Failure to Effectively Impeach the Integrity of Police Photo Lineup Procedures*

Clardy asserts that his trial counsel was ineffective for "failing to direct the jury's attention to the significant procedural improprieties surrounding the photo lineups police conducted with Melissa and Kent [Clouatre], the latter of which was the primary evidence the State used to link Mr. Clardy to the shooting." (Doc. No. 1 at 64–65.) In particular, he points out that Melissa Clouatre testified at trial that she could not identify anyone from the lineup—but this testimony was untrue, because she had actually identified someone other than Clardy, a fact that Detective Satterfield confirmed during his trial testimony. (*Id.* at 65 (citing Trial Tr. 52, 111–12, 202–03).) While Kent Clouatre positively identified Clardy during the lineup, as Satterfield confirmed, Kent Clouatre also stated to police that he had "already seen" Clardy's photo before he was given the

photo array. (*Id.* (citing Post-Conviction Tr. 73).) According to Clardy, that testimony suggests that Kent Clouatre had viewed the photo and possibly even discussed it with police officers before the police began filming the lineup procedure, thus "rais[ing] questions about whether police conducted the lineup in a manner that was improperly suggestive." (*Id.*) Concerns of impropriety, according to the petitioner, are enhanced here because the detective who conducted them has a history of "misconduct related to identifications." (*Id.* at 66 (citing *State v. Spurlock*, 874 S.W.2d 602, 618 (Tenn. Ct. Crim. App. 1993) (vacating conviction based in part on "testimony from Detective Satterfield that both [the prosecutor] and Satterfield knew was false)).)

Clardy argues that his lawyer was ineffective because she failed either to notice or to bring any of this material to the jury's attention at trial and that this deficient performance was undoubtedly prejudicial. Clardy does not address the question of whether the trial court's conclusions to the contrary were unreasonable. In his Answer, the respondent contends that this claim is procedurally defaulted and barred from review. (Doc. No. 12 at 16–17.) In his Reply, Clardy argues that he did not waive this claim because he "raised the issue about Detective Satterfield's past misconduct in his initial *pro se* post-conviction petition," which was incorporated by reference into his amended petition. (Doc. No. 18 at 18.) Clardy also asserts that he "specifically described the problems with the photo lineups in his own testimony." (*Id.* (citing Post-Conviction Tr. 299–301).) Further, Clardy maintains that, even if he did "waive" the claim in state court, any procedural default should be excused for two reasons: (1) Clardy has "established his actual innocence in accordance with the 'gateway' innocence exception to procedural default," and (2) Clardy received ineffective assistance of post-conviction counsel. (*Id.*) He asserts that this court should review the claims *de novo*, since they were not reviewed by the TCCA. (*Id.* at 19.)

The Magistrate Judge, in addressing this claim, notes first that "Clardy has baked several subclaims into this one, including that trial counsel failed to mention the improprieties related to Kent's identification from the photo lineup, that counsel did not know that Ms. Clouatre failed to positively identify Clardy in the photo lineup, and that counsel failed to impeach Detective Satterfield's prior misconduct." (Doc. No. 25 at 31 (citing Doc. No. 1 at 64–67).) The Magistrate Judge closely examined the administrative record to determine that only the first subclaim, "that trial counsel failed to raise the improprieties related to Kent's identification," was properly exhausted in the state court. (Doc. No. 25 at 32–34 & n.11.) Clardy raised the claim pertaining to counsel's failure to recognize that Melissa Clouatre had identified someone else in the photo lineup on appeal, but not in his original *pro se* petition or the final amended petition. He raised the issue about trial counsel's failure to explore Detective Satterfield's prior misconduct in his original *pro se* petition but did not raise it on appeal. (*Id.* at 32–33.) The Magistrate Judge declined to review the two sub-issues that were either waived or not fully exhausted. (*See id.* at 34.)

As for the properly exhausted subclaim regarding trial counsel's failure to impeach the photo lineup presented to Kent Clouatre,[5] the Magistrate Judge asserts in a somewhat conclusory fashion that the issue was "vigorously examined" and that "the court cannot conclude that trial counsel was ineffective for failing to cross examine Kent regarding the speculation that there might have been some impropriety in the photo identification by Kent." (*Id.*)

The petitioner does not object to the R&R's "description of when and how" he raised the issues in this claim but reiterates his "gateway innocence" claim to excuse the default, discussed

---

[5] Somewhat confusingly, the R&R states that "the only part of this subclaim that was *neither waived nor exhausted* was trial counsel's failure to impeach the photo lineups—specifically as it related to Kent—which was raised in Clardy's *pro se* petition and on appeal to the TCCA." (Doc. No. 25 at 34.) Given the context, the court understands that the Magistrate Judge intended to state that this issue was neither waived nor *defaulted*.

separately below. And he objects to the R&R's summary rejection of the single fully exhausted issue on the basis that it clearly was not "vigorously" examined at trial and that he was clearly prejudiced by trial counsel's failure. The respondent maintains that the TCCA did not address this claim so it was procedurally defaulted. The respondent fails to recognize that the state court's failure to address a properly preserved claim does not equate to a failure to exhaust.

In his original *pro se* petition, Clardy argued that counsel was ineffective for failing to "impeach the C.D. of the photo lineup that was highly suggestive" and that the video of the lineup "would have shown that victim and law enforcement had motives to put the blame on Petitioner." (Doc. No. 10-14 at 51.) His amended petition incorporated by reference all claims in his *pro se* petition. (Doc. No. 10-16 at 34.) When the post-conviction court addressed only those claims raised in the amended petition, counsel moved to consider the claims raised in the *pro se* petition, which the court denied without explanation. (*See* Doc. No. 10-19 at 8.) On appeal, this issue was presented as counsel's failure to impeach Satterfield's credibility "with the improper presentation of the lineup to Kent Clouatre, which was recorded, and could have been played for the jury." (Doc. No. 10-21 at 58.) The TCCA found this claim waived because the claim that counsel was ineffective "because she failed to impeach Detective Satterfield effectively" was "not presented in the numerous petitions filed in this case nor were these claims argued at the post-conviction hearing." *Clardy II*, 2018 WL 5046032, at *7.

The TCCA appears to have been incorrect in reaching that conclusion, and the respondent provides no cogent argument in support of his assertion that this claim was not fully exhausted by being raised in the *pro se* petition and in the post-conviction appeal based substantially on the same factual grounds and under the same legal theory of ineffective assistance of counsel. The only difference between the two is that the *pro se* petition inartfully framed the issue as counsel's failure

to "impeach" the video of the photo array, rather than as a failure to impeach Satterfield about the video of the photo array.

Regardless, at trial, counsel questioned Kent Clouatre about this issue, and he frankly stated, "it was that day they showed me the photograph, I picked it out and then they recorded, I believe." (Trial Tr. 112.) Counsel repeated, "Picked it out and then they recorded it." (*Id.*) Counsel testified that she had viewed the video of the photo lineup presented to Kent during trial (Post-Conviction Tr. 210), and it is unclear what she could have done to impeach Satterfield or what additional evidence questioning him on this topic would have revealed. Satterfield did not testify at the post-conviction hearing, and there is no actual evidence of impropriety. Clardy's speculation to the contrary is insufficient to establish prejudice, even if the court presumes that trial counsel's performance was deficient. He is not entitled to relief on the basis of this issue.

> 4. *Trial Counsel's Failure to Identify or Investigate a Blood Trail at the Crime Scene*

The petitioner's next IAC claim is that trial counsel's performance was deficient in that she failed to "conduct an adequate investigation of the crime scene, which would have drawn counsel's attention to the blood trail leading away from the body shop." (Doc. No. 1 at 69.) This claim actually includes two components. Clardy argues that counsel was deficient, first, because she failed to conduct DNA testing on blood spills at the scene of the incident, which would have confirmed that the blood was Kent Clouatre's. Second, he contends that counsel was deficient because she failed to recognize that there was a trail of Clouatre's blood leading away from the shop, which would have provided a ground for impeaching Kent's credibility, because he testified that he never went further than the immediate exterior of the shop between the time of the shooting and the arrival of paramedics. (*See* Trial Tr. 87–91.) The respondent expressly acknowledges that "Petitioner fully exhausted this claim in state court, and it is properly before the Court on habeas

review." (Doc. No. 12 at 17.) He argues that the TCCA properly concluded that the petitioner failed to establish deficiency or prejudice. (*Id.*) The R&R, in light of that express concession, incorrectly concluded that the claim was not fully exhausted.

The TCCA addressed the claim in relevant part as follows:

> Petitioner claims that trial counsel was deficient because she did not investigate a trail of blood that led away from the crime scene. . . .
>
> The post-conviction court did not find trial counsel deficient for not having the blood trail tested for DNA. . . .
>
> Though we conduct a *de novo* review, we agree with the post-conviction court's reasoning. There was no evidence that any suspect was injured. Thus, it was likely, even without DNA testing, that the blood belonged to one of the victims. Trial counsel was not deficient for foregoing DNA testing of the blood trail. Kent testified that he stayed at the shop after the shooting, and a match of the DNA from the blood to Kent may have given trial counsel another point on cross-examination. But, it would not have affected the outcome of the trial. Thus, trial counsel was not deficient, and Petitioner was not prejudiced.

*Clardy II*, 2018 WL 5046032, at *4–5.

Clardy argues that counsel's performance was deficient insofar as she failed to adequately investigate the trail, or even to discover it, so her purported strategic choice not to conduct forensic testing of blood at the scene is not entitled to deference. He also argues that the state court's conclusion that he was not prejudiced is in error, because the failure deprived him of a basis for impeaching the credibility of Kent Clouatre's eyewitness testimony, as the path of the blood trail conflicts with his testimony that he remained just outside the garage and then went inside to tend to his brother as soon as the shooters fled. He argues that, contrary to the state court's conclusion,

> such fertile impeachment ground would have been a boon to Mr. Clardy's defense. Because Kent's identification of Mr. Clardy was the only evidence linking him to the crime scene, any basis for calling that identification into question was critical information for the jury. Indeed, where the state's entire case rested on Kent's credibility, physical evidence showing that his testimony was inaccurate creates a reasonable probability that the jury would have reached a different conclusion had that evidence been presented at trial.

(Doc. No. 1 at 71–72 (citing *Sims v. Livesay*, 970 F.2d 1575, 1577, 1581 (6th Cir. 1992)).)

In *Sims*, however, the Sixth Circuit engaged in a *de novo* review of the petitioner's IAC claim, without the deference to the state court's findings and conclusions of law now required by AEDPA. In this case, irrespective of whether this court agrees with the TCCA's findings, the question "is not whether a federal court believes the state court's determination under *Strickland* was incorrect, but whether that determination was unreasonable—a substantially higher threshold.'" *Hendrix v. Palmer*, 893 F.3d 906, 921–22 (6th Cir. 2018) (internal quotation marks and brackets omitted) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "To qualify as 'unreasonable,' the state court's adjudication of the claim must have been 'so lacking in justification' that it amounts to 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103).

The state court's conclusion that trial counsel was not deficient in failing to conduct DNA testing of the blood trail was not unreasonable. Counsel testified that, although she believed Clardy's assertion of innocence, as a defense attorney she always maintained a measure of skepticism, and she did not want to take a chance that his DNA might turn up on the scene, since, "at that point, there was nothing forensically linking [Clardy] to the shooting." (Post-Conviction Tr. 191, 208–09.) That decision was not unreasonable, irrespective of the fact that, as the TCCA noted, there was no evidence that any of the perpetrators on the scene were wounded. If anything, the fact that there was no evidence that any perpetrator was wounded further obviated any need to test the blood on the scene, since it was highly likely to belong to one of the victims and to add nothing to Clardy's case.

Clardy also insists that his counsel's performance was deficient insofar as she failed to notice that a blood trail existed at all. The state court appears to have skipped over the question of

performance, insofar as it stated only that "a match of the DNA from the blood to Kent may have given trial counsel another point on cross-examination. But it would not have affected the outcome of the trial. Thus, trial counsel was not deficient, and Petitioner was not prejudiced." *Clardy II*, 2018 WL 5046032, at *5. In other words, the court seemed to have worked backward from the (conclusory and unsupported) assertion that cross-examining Kent Clouatre would not have changed the outcome of the trial to conclude that counsel was not deficient, rather than treating these as two separate inquiries.

Regardless, even on a *de novo* review rather than a deferential view of the court's decision, this court cannot find that counsel's performance in failing to investigate the blood trail "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688). Counsel testified that she reviewed the available photos of the crime scene and visited the scene herself. (Post-Conviction Tr. 192–93.) Even from the color photos taken by the petitioner's investigator and introduced into evidence at trial, the blood drops are difficult to see, and certainly difficult to identify as blood. Moreover, from a trial-preparation perspective, there was simply no obvious reason for counsel to know either that DNA testing would be useful or that this trail of blood drops leading across the alley would contradict Kent Clouatre's later testimony at trial. Hindsight being what it is, this discovery and the ability to cross-examine Kent Clouatre about his testimony that he never left the side of the shop might well have cast doubt on his credibility, but counsel's failure to investigate the trail did not amount to constitutionally defective representation.

The petitioner is not entitled to relief on this claim.

> 5. *Trial Counsel's Failure to Effectively Cross-Examine Kent Clouatre about Drug Evidence*

Clardy asserts that trial counsel performed deficiently by failing to adequately cross-examine Kent Clouatre about the evidence that he and his brother were involved in drug-dealing.

(Doc. No. 1 at 72.) According to the petitioner, this evidence would have undermined Kent Clouatre's credibility and established a plausible motive for someone other than Clardy to attempt to kill the Clouatres. (*Id.*) The respondent concedes that this claim was fully exhausted in the state court, but he argues that the state court's determination of this issue was a reasonable applicable of the law and a reasonable determination of the facts. (Doc. No. 12 at 19.)

> The TCCA rejected this claim, as follows:

> At the post-conviction hearing, trial counsel divulged that her strategy was to steer clear of any mention of drugs at trial. She stated, "I found out that the victim and his surviving twin were dealing drugs out of the auto shop . . . . I didn't want [Petitioner] associated in the jurys' (sic) minds with drugs." She further explained, "Back in 2007 here is a young black male, with a predominately white jury, and to hear the word drugs[,] I was afraid that was all they were going to hear." "I made a conscious decision tactically because I did not want [Petitioner] associated in any way with the drug business," she added when speaking about a different piece of testimony.

> After reviewing this testimony, it seems clear to us that trial counsel made a reasonable strategic decision to avoid the mention of drugs. This was not deficient. However, even if it were, Petitioner has failed to establish a reasonable probability that the outcome of the case would have been different had trial counsel cross-examined Kent on those points.

Clardy II, 2018 WL 5046032, at *6.

The R&R found that this decision constituted a reasonable application of *Strickland*. The petitioner objects on the same grounds raised in his Petition: that the state court's decision was unreasonable because counsel's failure was not based on a thorough investigation and therefore could not have been a strategic choice. (Doc. No. 30 at 20.) He argues that counsel's testimony that she "did not even 'look into' impeaching Kent with the drug evidence" establishes her failure to investigate and to make a reasoned strategic decision. Second, he contends that her supposed strategic decision was unreasoned because the drug evidence in the record was connected to the Clouatres, not Clardy. (*See id.* ("Indeed, it is unclear why evidence about the *Clouatres'* involvement in drugs would have risked causing the jury to conclude that *Mr. Clardy* was at the

scene, particularly when Mr. Clardy's defense otherwise rested on mistaken identification.").) He also incorporates by reference his argument regarding prejudice under *Strickland* from his Petition, which asserts that he was prejudiced because, by failing to call the jury's attention to Kent Clouatre's "highly questionable" statement that he did not recall any drugs available at the body shop, counsel forewent yet another opportunity to impeach Kent's credibility and to raise the inference that a drug dispute between Kent and the shooters was the true motive for the shooting. (Doc. No. 1 at 73–74.)

The court, however, also finds that the TCCA's decision did not amount to an unreasonable application of *Strickland*. The fact that the drugs on the scene would have been associated with the Clouatres would not obviate counsel's fear that any mention of drugs would reflect badly on her client or lead to a possible inference that Clardy was involved in drugs. Counsel testified that she was aware that Clardy's record included "a bunch of drug charges." (Post-Conviction Tr. 197.) And she also testified unequivocally that she "made a conscious decision tactically" not to "use the whole drug theme" because, as she explained,

> I did not want [Clardy] associated in any way with the drug business.
>
> I didn't trust the jury to look at him and not automatically assume, well, he must be involved in a drug deal with these people. And if these people are dealing drugs and they are having their own little spats and fights, what is to exclude him from being there?

(Post-Conviction Tr. 205–06.) In other words, counsel's statement that she did not "look into" trying to impeach Kent or Melissa Clouatre about their use of drugs that evening is somewhat of a red herring. Counsel made a reasoned, tactical decision to steer entirely clear of the entire "drug theme" to prevent possible prejudice to her client.

Regardless, again, the standard is whether the state court was reasonable in finding that counsel's performance did not fall below an objective standard of reasonableness. The state court's

review of this issue was not unreasonable, and Clardy is not entitled to relief on the basis of this claim.

> 6. *Cumulative Prejudice Arising from Trial Counsel's Deficient Performance*

The petitioner asserts that he is entitled to relief on the basis of the cumulative prejudice arising from his trial counsel's "myriad errors," even if no single error gave rise to sufficient prejudice to warrant habeas relief. (Doc. No. 30 at 20.) The state court considered this claim and recognized that such a claim may be viable under Tennessee law but concluded that, in the post-conviction context, "'a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient.'" *Clardy II*, 2018 WL 5046032, at *7 (first citing *State v. Hester*, 324 S.W.3d 1, 76–77 (Tenn. 2010); and then quoting *Gooch v. State*, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015)). The court found that, because Clardy had not proved that his trial counsel was deficient or that he was prejudiced by any alleged deficiency, "the cumulative error doctrine does not apply in this case." *Id.*

While it is unclear whether the cumulative error doctrine ever applies in the § 2254 context,[6] this court finds that the state court's determination that it did not apply in this case was

---

[6] In *United States v. Dado*, on which the petitioner relies, the Sixth Circuit indeed held that, when assessing prejudice arising from alleged ineffective assistance of counsel under *Strickland*, courts "must consider the totality of the evidence" and that a verdict" only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 759 F.3d 550, 563 (6th Cir. 2014) (citing *Strickland*, 466 U.S. at 695–96). The court explained that "examining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *Id.* (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)). *Dado*, however, was a direct appeal of a federal conviction in which the defendant raised IAC claims, and the court applied *Strickland* directly. *Lundren* was a § 2254 case, but it merely recited the *Strickland* standard and then concluded that the state court's conclusions that trial counsel was not ineffective were not "contrary to or an unreasonable application of federal law." *Lundren*, 440 F.3d at 770, 774; *see also id.* at 776–77. And it summarily rejected the petitioner's cumulative error claim. *Id.* at 775. In other contexts, the Sixth Circuit has held that the

not unreasonable under *Strickland*. For each of the claims addressed above, the TCCA reasonably concluded either that counsel's conduct was not deficient or that, even if it was, Clardy did not establish prejudice. He is not entitled to relief based on cumulative error.

### B. Actual Innocence Claims

#### 1. Freestanding Actual Innocence Claim

Clardy raises a free-standing actual innocence claim, and he fully exhausted the claim in the state court, which reviewed the claim under Tennessee law and concluded that Clardy failed to meet the applicable state standards for proving actual innocence. In this court, Clardy acknowledges that neither the Supreme Court nor the Sixth Circuit has recognized a free-standing actual innocence claim on federal habeas review outside the capital context. (Doc. No. 1 at 76.) He raises the claim simply to preserve appellate review of this issue. (*Id.*)

This court is bound by precedent to reject this claim. *Accord Garcia v. Burt*, No. 17-1951, 2018 WL 846591, at *5 (6th Cir. Feb. 5, 2018) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). Clardy is not entitled to relief based on his actual innocence claim.

#### 2. Gateway Innocence Claim

The Sixth Circuit and the Supreme Court have both recognized, however, that actual innocence may provide a "means by which a habeas petitioner can overcome the procedural default

---

cumulative error doctrine does not apply in § 2254 cases. *See, e.g.*, *Daniels v. Jackson*, No. 18-1342, 2018 WL 4621942, at *6 (6th Cir. July 17, 2018) ("[T]he law of [the Sixth Circuit] is that cumulative error claims are not cognizable on habeas [review] because the Supreme Court has not spoken on this issue." (quoting *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006)) (alterations added in *Daniels*)).

of his claims." *Id.* (citing *Herrera*, 506 U.S. at 404). A so-called "gateway innocence" claim is not a substantive claim. "Rather, it allows a petitioner to overcome a procedural barrier . . . based on the 'miscarriage of justice' that results from the 'incarceration of innocent persons.' Actual innocence, in this sense, operates as a 'gateway' by which a petitioner may belatedly file other constitutional and federally cognizable claims." *Hubbard v. Rewerts*, 98 F.4th 736, 742–43 (6th Cir. 2024) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392, 393 (2013)). To proceed with a gateway innocence claim, the petitioner must present "new reliable evidence" of "factual innocence, not merely legal insufficiency." *Id.* at 743 (first quoting *Schlup*, 513 U.S. at 324; and then quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

As the Sixth Circuit explained, pointing to the example of *House v. Bell*, 547 U.S. 518 (2006), this is a very high bar:

> In *House*, a woman named Carolyn Muncey was murdered and her body found in a ditch on the side of the road. During the initial search for Muncey after her unexpected disappearance, her cousin noticed Paul House climbing out of an embankment with a rag, wiping his hands. When authorities found Muncey's body near that ditch, House became the prime suspect and was charged with her murder. The State presented voluminous evidence, but primarily relied on the finding of Muncey's blood on House's jeans and House's semen on Muncey's person.
>
> On collateral review, House conclusively demonstrated that the blood found on his pants was due to the negligent spillage of blood from Muncey's autopsy in the same evidence box carrying his jeans. House further proved that the semen found on Muncey was not his but her husband's. Despite these new revelations' effectively dismantling the State's entire case, the Court required more. Only after House provided a credible confession by Muncey's husband as the true perpetrator did the Court find that he met the actual-innocence test to permit his federal habeas claim to proceed.

*Id.* at 744 (internal citations omitted). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 536–37 (internal quotation marks omitted). That is, the "petitioner [must] show the probability of his

*innocence*, rather than merely impeach the State's case. This means that a defendant must put forth some type of reliable evidence that is exonerative in nature. That evidence need not *conclusively prove* his exoneration to make the gateway showing, but it must, at minimum, go towards his innocence." *Hubbard*, 98 F.4th at 747.

The new evidence to which Clardy points in this case—ballistics evidence that points toward Dantwan and Thomas Collier, additional evidence impeaching Kent Clouatre's testimony, new testimony on eye witness identification from Dr. Neuschatz, and information about Detective Satterfield's history of misconduct—all goes towards impeaching the state's case rather than proving his own innocence. True, he also points toward Mason's alibi evidence, but that is corroborative evidence rather than truly new evidence. Moreover, as set forth above, the jury effectively heard that evidence. In short, Clardy's new evidence falls short of establishing factual innocence. Clardy has not presented a viable gateway innocence claim that would permit the court to consider his defaulted claims.

## IV.    CERTIFICATE OF APPEALABILITY

When a district court enters a final order denying a § 2254 petition, it must also issue or deny a certificate of appealability ("COA"). Rule 11(a), Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless this court or the Sixth Circuit Court of Appeals issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when a petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues presented were "adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003).

Here, the court finds that the petitioner's claim that counsel was constitutionally ineffective for failing to investigate or request ballistics testing on the firearms evidence found at the crime scene is "adequate to serve" such encouragement. *Id.* In particular, the court observes that the TCCA's determination that counsel made a reasoned strategic decision was based in large part on the court's conclusory assertion that, "if the ballistics testing had revealed a match to a firearm registered to Petitioner, then Petitioner would have had abysmal chances of prevailing at trial." *Clardy II*, 2018 WL 5046032, at *4. But counsel knew, or should have known, that no firearm had ever been registered in Clardy's name, obviating that concern. And Clardy was clearly prejudiced by this failure, as the identification of other individuals associated with the gun used in the Clouatre shooting would, at a minimum, have allowed for the development of other suspects. The court, accordingly, will issue a COA as to this claim.

However, the other issues raised in the petition do not merit further review. As to these issues, the court declines to issue a COA, but Clardy may seek a COA directly from the Sixth Circuit. Rule 11(a), Rules Gov'g § 2254 Cases; Fed. R. App. P. 22(b)(1).

## V.   CONCLUSION

For the reasons discussed above, the court will overrule the petitioner's Objections (Doc. No. 29), deny Clardy's Petition for Writ of Habeas Corpus (Doc. No. 1), and deny a COA.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge